# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **JUAN DE LOS SANTOS** | )   **No. 23-cv-11305-DJC** |
|      **PLAINTIFF,** | ) |
| **V.** | ) |
| | ) |
| **SERVICE EMPLOYEES INTERNATIONAL** | ) |
| **UNION LOCAL 615 32BJ and** | ) |
| **BOSTON UNIVERSITY** | ) |
|       **DEFENDANTS,** | ) |

## PLAINTIFF'S MOTION IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED.R.CIV.P. RULE 12(b)(6)

NOW COMES, the plaintiff, Juan De Los Santos, through his Attorney, James E. Neyman, Esq. who hereby files this Motion in Opposition to the defendants Motion to Dismiss.

    The defendant Boston University's Motion to Dismiss under Rule 12(b)(6); is devoid of merit because on April 3, 2024, the remaining defendant Boston University previously filed an Answer under Federal Rule of Civil Procedure Rule 8(a). See Plaintiff's separately filed Memorandum in Support of Plaintiff's motion.

**Respectfully submitted,**
**Plaintiff Juan De Los Santos**
**By His Attorney**

/s/James E. Neyman

---

**James E. Neyman, Esq. (555229)**
**76 Canal Street, 3rd Fl.**
**Boston, MA 02114**
james@neymanandassociates.com
**617.723.2627**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **JUAN DE LOS SANTOS** | ) No. 23-cv-11305-DJC |
| **PLAINTIFF,** | ) |
| **V.** | ) |
| | ) |
| **SERVICE EMPLOYEES INTERNATIONAL** | ) |
| **UNION LOCAL 615 32BJ  and** | ) |
| **BOSTON UNIVERSITY** | ) |
| **DEFENDANTS,** | ) |

### PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S MOTION TO DISMISS
### PURSUANT TO FED.R.CIV.P. RULE 12(f)

NOW COMES, the plaintiff, Juan De Los Santos, through his Attorney, James E. Neyman, Esq.

who hereby files this Motion to Strike pursuant to Fed.R.Civ.P 12(f), because defendant's Motion

to Dismiss is devoid of merit, *"immaterial, and impertinent"* because on April 3, 2024, the

remaining defendant Boston University previously filed an Answer under Federal Rule of Civil

Procedure Rule 8(a). Therefore, defendant waived their right to subsequently file a Motion to

Dismiss.  See Plaintiff's separately filed Memorandum in Support of Plaintiff's motion..


**Respectfully submitted,**
**Plaintiff Juan De Los Santos**
**By His Attorney**


**/s/James E. Neyman**

---

**James E. Neyman, Esq.**
**76 Canal Street, 3ef Fl.**
**Boston, MA 02114**

james@neymanandassociates.com
617.723.2627

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **JUAN DE LOS SANTOS** | ) **No. 23-cv-11305-DJC** |
| **PLAINTIFF,** | ) |
| **V.** | ) |
| | ) |
| **SERVICE EMPLOYEES INTERNATIONAL** | ) |
| **UNION LOCAL 615 32BJ  and** | ) |
| **BOSTON UNIVERSITY** | ) |
| **DEFENDANTS,** | ) |

### PLAINTIFF'S MOTION TO AMEND COMPLAINT PURSUANT TO FED.R.CIV.P. RULE 15(a)

NOW COMES, the plaintiff, Juan De Los Santos, through his Attorney, James E. Neyman, Esq. who hereby files this Motion Amend his complaint pursuant to Fed.R.Civ.P 15(a).  As reasons, the plaintiff incorporates the two separately filed Sworn Affidavits of plaintiff, Juan De Los Santos, and the separate Sworn Affidavit of the plaintiff's son, John De Los Santos, which described facts that were maliciously and/or conspicuously omitted from being brought forth by defendant Boston University's Human Resources Office, regarding awarding son 90% free tuition, and superseding the original decision to terminate plaintiff.  Furthermore, plaintiff, was not a signatory to the collective bargaining agreement or Union, based on evidence provided by Defendant BU and as such, this Court must permit Plaintiff to raise prior facts withheld from this Court about plaintiff's communication and linguistic language barrier disability under Title III of the ADA, 504, Tite VI,

42 U.S.C. § 1981, and numerous torts under supplemental ancillary jurisdiction.

**Respectfully submitted,**
**Plaintiff Juan De Los Santos**
**By His Attorney**

/s/ James E. Neyman

---

**James E. Neyman, Esq.(555229)**
**76 Canal Street, 3rd. Fl.**
**Boston, MA 02114**
**james@neymanandassociates.com**
**617.723.2627**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **JUAN DE LOS SANTOS** | ) **No. 23-cv-11305-DJC** |
| **PLAINTIFF,** | ) |
| **V.** | ) |
| | ) |
| **SERVICE EMPLOYEES INTERNATIONAL** | ) |
| **UNION LOCAL 615 32BJ  and** | ) |
| **BOSTON UNIVERSITY** | ) |
| **DEFENDANTS,** | ) |

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, AND IN SUPPORT OF PLAINITFF'S MOTION TO STRIKE PURSUANT TO FED.R.CIV.P. RULE 12(f) AND IN SUPPORT OF LEAVE TO AMEND COMPLAINT PURSUANT TO FED.R.CIV.P RULE 15(a)[1]

## I.    INTRODUCTION

NOW COMES, the plaintiff, Juan De Los Santos, through his Attorney, James E. Neyman, Esq. who hereby files this Memorandum of Points and Authorities in Support of three separate Motions filed in response to the defendant's improper and void Motion to Dismiss under Rule 12(b)(6).  The three separate Motions are the following;

- Motion in Opposition to defendant's Motion to Dismiss.

- Motion to Strike defendant's Motion to Dismiss under Fed.R.Civ.P. Rule 12(f).

- Motion for Leave to Amend plaintiff' complaint under Fed.R.Civ.P.Rule 15(a).

---

[1] Plaintiff's Proposed Amended Complaint will be filed separately.   The plaintiff hereby incorporates Exhibits "1" through "7" attached herein this Memorandum in support of denying the defendant's Motion to Dismiss under Fed.R.Civ.P. 12(b)(6), and in support of plaintiff's motion to Strike the Motion to Dismiss limited to addressing ***an insufficient defense or any redundant or impertinent material, and finally in support of Plaintiff's Motion to Amend plaintiff' s complaint, Under Rule 15(a); because of the facts delineated and described within separately filed Sworn Affidavits of (1). plaintiff' Juan De Los Santos, and his son (2). John De Los Santos, who advocated on father's behalf leading to awarding him 90% of free tuition to attend defendant BU, thereby superseding the previous decision to terminate plaintiffs as awarding tuition can only occur while plaintiff is employed.  See I.R.C. 117(d), and I.R.C. 127.***

1

The defendant's Motion to Dismiss is devoid of merit because on April 3, 2024, the remaining defendant Boston University previously filed an Answer under Federal Rule of Civil Procedure Rule 8(a).    See Exhibit "1" herein.    The defendant's judgment in filing a Motion to Dismiss, once they already filed an Answer to a complaint, back on April 3, 2024, they are considered to have waived their right to subsequently file a motion to dismiss, and this is a total abdication of the Federal Rules of Civil Procedure, and palpably incorrect.

However, the defendant Boston University did exactly that.  Next, the Defendant's erroneously argue that the defendant BU should be dismissed under 12(b)(6), in essence because Plaintiff's State law claims are preempted by § 301 of the Federal Labor Management Relations Act of 1947 (hereinafter "the LMRA"); or ("LMRA") cited as 29 U.S.C. § 107 (2012).  See also Labor Management Relations(Taft-Hartley) Act § 301, 29 U.S.C. § 185 (b) (2012). Some Scholars have referred to a "presumption in favor of preemption" **Robert M. Sagerian, <u>A Penalty Flag for Preemption" The NFL Concussion Litigation, Tortious Fraud, and the Steel Curtain Defense of Section 301 of the Labor Management Relations</u> Act, 35 T. Jefferson L. Rev. 229, 255 (2013).**  Here, this argument is also deficient based on newly discovered evidence <u>because</u> the plaintiff, is arguably a "Non-unionized employee" who never knowingly signed any written agreement that he ever knew would result in becoming a member of the Union, and his counsel properly sought damages for such conduct by their employers in state court prior to its removal by one of the defendants. See **Exhibit "2' herein; <u>plaintiff's signature is nowhere on the collective bargaining Union agreement.</u>**

Only Unionized employees face the risk that employers will seek to transfer the case to a federal district court in an attempt to immunize tort liability by claiming the complaint is preempted by § 301 of the Labor Management Relations Act of 1947 (LMRA).  See Law Review Article annexed herein as **Exhibit "7."**

Although § 301 remains essentially unchanged from the date of its adoption in 1947; judicial confusion

2

over the scope of its preemptive effect frequently has broadened an employer's ability to defeat state tort claims by its employees in the early stages of litigation with a motion to dismiss. As a result of this evolution and accompanying confusion, the common law rights of unionized workers have been unfairly circumscribed simply because their union entered into a collective bargaining agreement with their employer. Neither the statute's framers nor the Supreme Court opinions which delineated § 301's [2] impact intended such an expansive result in favor of management. Some scholars have referred to a "presumption in favor of preemption." Robert M. Sagerian, A Penalty Flag for Preemption: The NFL Concussion Litigation, Tortious Fraud, and the Steel Curtain Defense of Section 301 of the Labor Management Relations Act, 35 T. JEFFERSON L. REV. 229, 255 (2013). 4. See Regina Goshorn, Section 301, Tortious Interference, and the Sixth Circuit: Immunization for the Tortfeasor, 82 U. DET. MERCY L. REV. 253, 277 (2005).

## II.  UNDER U.S. SUPREME COURT PRECEDENT, THIS COURT MUST DENY THE DEFENDANT BOSTON UNIVERSITY'S ATTEMPT TO PREEMPT THE PLAINTIFF' CLAIMS UNDER Caterpillar Inc. v. Williams Caterpillar, 482 U.S. 386 (1987)

In **Caterpillar Inc. v. Williams, 482 U.S. 386 (1987)** the US Supreme Court emphasized that a plaintiff's complaint alone must be the basis for evaluating a § 301 preemption claim, not **on a defense mounted by an employer.**

   **In Williams, several employees began their employment with Caterpillar as union workers subject to a collective bargaining agreement. Eventually, they each were promoted to managerial or weekly salaried employees, which were non-unionized positions outside the scope of the agreement. According to these employees, Caterpillar's management consistently assured them that, if the plant**

---

[2] The Supreme Court found unions to be illegal combinations in restraint of the labor market and therefore, violative of the Sherman Act. Union members were also personally liable for any damages caused by their union.8 Harsh working conditions, the economic impact of the Great Depression, and the states' failure to regulate effectively multi-state business entities all contributed to a pro-union political majority in the 1930s. See **Loewe v. Lawlor, 208 U.S. 274, 283, 297 (1908).** Id. at 306, 308–09. See Levin, supra note 6, at 588–90, 597–601. 10. **Norris-LaGuardia Act, ch.** 90, 47 Stat. 70 (1932)

ever closed, they would have jobs in other Caterpillar facilities. These employees were later returned to their hourly unionized positions, subject to the collective bargaining agreement. Caterpillar eventually closed the plant and laid off this group of employees.

The former employees then filed a lawsuit in state court alleging breach of their employment promises and the contract that resulted therefrom. Caterpillar removed the case to federal court and asserted § 301 preemption.

The Supreme Court affirmed the Ninth Circuit's holding that the <u>lawsuit was not preempted by §</u> <u>301.  The Court began its analysis by stating that prior cases had established a two-part test for §</u> <u>301 preemption</u>:  "Section 301 governs claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.'"

However, <u>the test must focus on the allegations contained in a plaintiff's complaint, not on a defense</u> <u>mounted by an employer</u>: Caterpillar impermissibly attempts to create the prerequisites to removal by ignoring the set of facts (i.e., the individual employment contracts) presented by respondents, along with their legal characterization of those facts.

This is what defendant Boston University attempts to do: To focus on the defense of Preemption mounted by the employer BU, ignoring the allegations in the plaintiff's State Court complaint.

For of the above stated reasons, the Plaintiff relying upon <u>Caterpillar Inc. v. Williams,</u> 482 U.S. 386 (1987). (and cases cited therein); opposes, and moves to Strike the defendant's entire Motion to Dismiss, because it is procedurally defective, because an Answer was previously filed and  the defendant's Motion to Dismiss is improper and devoid of merit, because the plaintiff is a Non-Unionized Employee and not a Signatory to the Collective Bargaining agreement who did not knowingly sign a writing agreeing to be part of the former Defendant Union whom this Court granted Summary Judgment, which the plaintiff does not presently contest, because plaintiff is not a signatory to the Collective Bargaining agreement, and his "thick accent" and inability to fully read and understand, English, does not constitute a mutual agreement and a meeting of the minds.

### III.    PLAINTIFF MOVES TO STRIKE DEFENDANT'S IMPROPER MOTION TO DISMISS UNDER FED.R.CIV.P. 12(f)

Lastly, the Plaintiff seeks leave of court to Amend his complaint pursuant to Fed.R.Civ.P. Rule 15(a).   That

under the Federal Internal Revenue Code, IRC 117(d); plaintiff's son advocated and succeeded in being awarded 90% free tuition based on advocating that his father the Plaintiff's termination was erroneous; See Affidavit of John De Los Santos. **That Defendant Boston University is well aware that the undersigned Plaintiff's counsel submitted a letter(s) on his firm's letterhead dated February 14, 2022, because the Union contact Carmen Fonseca, "refused to let me participate in the meeting on behalf of my client Plaintiff Juan, which follows a continuing pattern of /by the Union since you refuse to advise who the attorney, if any or members information, who are partaking; which constitutes deceit and/or fraud and interference with plaintiff's rights; See Exhibit "5" herein.**

- **The Defendant BU is well aware that he plaintiff was unlawfully precluded from partaking in the process from letter(s) written by plaintiff's counsel documenting these inactions. See Exhibit "5" herein.**

In Farzinpour v. Berklee College of Music, 616 F. Supp. 3d 98 (D. Mass. 2022);  **the Court held, the following test should apply when analyzing the plaintiff's Title IX claim.**

- **gender bias may be inferred when the following four factors are all met**: the school made findings against the accused male that were incorrect and contrary to the weight of the evidence; **failed to follow its procedures to protect the accused**; failed to seek out potential witnesses; and faced criticism for not addressing female complaints against males.

- **Based on these factors, the Court found that the plaintiff had offered sufficient facts to survive a motion for summary judgment on the claim that the university acted based on gender bias as a motivating factor, particularly because the student admitted that she "tested" the plaintiff to determine his sexual intent and admitted that her actions "looked questionable."***

Analogously, in the instant case, like in Farzinpour v. Berklee College of Music, 616 F. Supp. 3d 98 (D. Mass. 2022) , the defendant Boston University.

- **made findings against the accused male that were incorrect and contrary to the weight of the evidence.**
- **failed to follow its procedures to protect the accused;**
- **failed to seek out potential witnesses; and faced criticism for not addressing female complaints against males;**

5

For all these reasons, thus far alone based on the most recent Farzinpour case, and the remaining discriminatory actions and deliberate indifferent treatment here of the Dominican Spanish Plaintiff, through counsel, he formally requests leave of court to amend his complaint, pursuant to Fed.R.Civ.Rule 15(a).    Due to recent discovery of previously unknown facts, related to the decision of the Boston University' Human Resources Department to reconsider the plaintiff's termination of employment at the request of plaintiff's son John Noel Delasantos Esparza, who requested tuition waiver, which was granted. See **separately filed** Sworn **Affidavit of Plaintiff's son, John Delasantos, and attached Exhibits 1-4;** including emails directly from BU'S Human Resources office, granting son's request to award him 90% of free tuition waiver, thereby reconsidering the prior termination designation of plaintiff Juan Delasantos and tenure which was granted, which constitutes reconsideration of plaintiff's termination of employment status.  **See Exhibit "1" herein; IRC 117.**

The Plaintiff states that, it is the Defendant Boston University's Human Resources decisions to terminate the plaintiff Juan De Los Santos, that is preempted by the Internal Revenue's Code ("I.R.C. 117(d)"); and the defendants have omitted crucial germaine facts from this Court, for failing to provide numerous **facts that warrant the plaintiff to be** (1). **re-hired as a Janitor; (2) awarded lost wages for last four years at $ 60,000 times four equaling approximately $ 240,000, and damages and (3). attorney's fees for (4). flagrant violations of the plaintiff's Communication and Linguistic Disabilities in violation of Title III of the Americans with Disabilities Act[3] in employment leading up to wrongful termination of employment.**

---

[3] **Boston University's Janitorial Department gathered sworn Affidavits from three White Non-Hispanic co-workers who all essentially wrote and/or commented that plaintiff's Juan De Los Santos was "awkward" "spoke with an accent," and was difficult to understand, all as a Pretext knowing that plaintiff' suffered communication and linguistic language barriers, whereby Defendant BU discriminated against plaintiff,  and although plaintiff has a thick accent and speaks poor English according to co-workers, plaintiff was accused of speaking to Co-Worker Baker, and stating "I want to F\*\*k you."  Genuine issues of material fact exist in this controversy requiring a Jury of plaintiff's peers to evaluate and determine whether plaintiff is more credible than three White Co-workers**

The complaint must be amended to adduce and plead facts, never known to the plaintiff until his son identified germaine and crucial emails roughly in the past two weeks, which substantiate that Boston University has violated IRC § 117(d) by virtue of defendant Boston University's Human Resources Office, re-hiring plaintiff by virtue of coding his employment as current to permit his Son and Dependent John to be awarded 90% of free Tuition waiver. See Sworn Affidavit of John De Los Santos.

The plaintiff's counsel has discovered in the last month from interviewing plaintiff's Son, John De Los Santos, and receiving his sworn Affidavit that this lawsuit is really about "mixed-motive" age discrimination claims under 29 U.S.C. § 623(a)(1) in which plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial); that age was "but-for" cause of employer's adverse action, and so burden never shifts to employer to show that it would have taken adverse action regardless of age. See Gross v. FBL Fin. Servs Inc., 557 U.S. 167, 129 S. Ct. 2343 (2009).

In addition this lawsuit is about violations of Title III of the ADA, 42 U.S.C. § 1981; 504 of the Rehabilitation Act of 1973; Defamation of character and intentional infliction of emotional distress, by former co-workers, and Boston University Police, who potentially committed libel in writing to plaintiff to order that he never enter premises, when he is terminated, (See Exhibit "4" herein).

Plaintiff's own son and dependent successfully advocated and succeeded in having the decision to terminate the Plaintiff superseded and reconsidered by virtue of awarding the son 90% of free  tuition. See separate **Affidavit of John De Los Santos and Exhibits 1-4.**

Persuaded by this line of cases interpreting the analogous language and policies of Title VII and Title IX, Plaintiff asserts that there is a plausible cause of action under the ADA and the Rehabilitation Act for a hostile work environment when harassment based on a disability has "the purpose or effect of

---

**who all claims plaintiffs could not be understood; and whether plaintiff' accent was thick and how he could have made sexually harassing statements that can be understood when his accent is too think to clearly understand and his second language being English.understand.**

unreasonably interfering with [the] individual's performance or [of] creating an intimidating, hostile, or offensive environment." *Brown,* 68 F.3d at 540

The plaintiff Juan De Los Santos moves to amend his complaint, and seek compensatory relief, front and back pay, and monetary damages for suffering emotional distress, for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., the Rehabilitation Act, 29 U.S.C. § 794, Title VI, 42 U.S.C. § 2000d; 42 U.S.C. § 1981; and damages for breach of Contract, Defamation by Boston University Police Department, intentional infliction of emotional distress for the discriminatory behavior of BU former employee, and accuser, Baker, himself subsequently terminated as understood by Plaintiff and co-workers, who discriminated against plaintiff De Los Santos for his poor English compounded by his thick accent, which despite Plaintiff's former Co-Workers claiming Juan was "awkward" and hard to understand his English; Juan's work colleague Baker simultaneously claims, plaintiff made sexual remarks and statements, in English that were deemed by the defendant to clearly satisfy Sexual Harassment in violation of Title IX, without plaintiff's being provided a full hearing with an interpreter to assist in questioning the accuser.

Genuine issues of material fact exist, requiring a jury to evaluate whether the treatment of plaintiff was subjected the kind of working conditions *"that courts have found sufficient to establish severe and pervasive harassment that alters a plaintiff's working conditions. See* Haysman v. Food Lion, Inc., 893 F. Supp. at 1098 (describing the supervisors' threatening and berating attitudes and statements, extreme profanity, and physical assaults on the disabled plaintiff); *Davis v. York Int'l, Inc.,* 1993 WL 524761, at *10 (D.Md.1993) (assessing disabled plaintiff's allegations that her supervisor mocked her speech and gait, spread myths and rumors about her condition, blamed her for other workers' errors, hovered over her excessively while she worked, threatened to remove her equipment, and denigrated her abilities privately and publicly).

IV.    **DEFENDANT BOSTON UNIVERSITY TRUSTEES ACTIONS IN AWARDING SON JOHN DE LOS SANTOS' TUITION FOR FOUR YEARS AND PERMITTING PLAINTIF'S SON JOHN DE LOS SANTOS TO PARTICIPATE IN GRADUATION OF MAY 16, 2024, AMOUNTS TO PLAINTFF BEING CONSTRUCTIVELY REHIRED; AND BE AWARDED BACK PAY WRONGFULLY WITHHELD SINCE YEAR 2020; OTHER DAMAGES AND ATTORNEYS FEES, AND COSTS**

The Defendant Boston University has intentionally and improperly omitted and concealed from the facts of their Motion to Dismiss and every other pleading filed in this Honorable U.S. District Court for the District of Massachusetts (Boston), that the same exact BU Human Resources Department, that terminated the plaintiff's employment based on false and conjured up allegations of sexual harassment in violation of Title IX, granted the son of the Plaintiff, John Delasantos full tuition waiver permitting him to earn and achieve a four year Bachelor's Degree in Economics resulting in the reclassification of Plaintiff's employment status to be in good standing.

The IRS's Federal Qualified Tuition Reduction IRC Section 117 allows nonprofit universities to give their employees, spouses, or dependents tuition reductions that are excluded from taxable income. This long-standing provision helps employees and members of their families afford a college education, providing an important benefit to many middle- and low-income university employees. **See Exhibit "1."**

**What is Qualified Tuition Reduction?**

Section 117 (d) of the Internal Revenue Code allows nonprofit universities to give their employees, spouses, or dependents tuition reductions that are excluded from taxable income. This long-standing provision helps employees and members of their families afford a college education, providing an important benefit to many middle- and low-income college employees. See Exhibit "1."

The qualified tuition reduction in the form of "tuition remission," and "tuition waiver," or a "tuition grant, was awarded by defendant Boston University's Human Resources Office, after several back and forth emails between plaintiff's son John, who asked the his father's terminated employment status, be reconsidered, (which was granted); thereby superseding the previous decision to terminate the plaintiff's

9

employment.  See **Affidavit of John De Los Santos with attached Exhibits.**

For purposes of IRC Section 117(d): Plaintiff was coded as a current employee and treated as an employees in good standing and prior separation from employment and from service with such employer the granting of free tuition to son John and individuals (e.g., a relative of the previously fired employee) and defendant Boston University for tax purposes under IRC Section 117(d): and the U.S. Department of Education's Federal Pell Grant, and other federal aid awarded, cannot continue to have the Defendant BU egregiously omit from the record of this Court this colossal IRS contradiction.

## V.    DEFENDANT BOSTON UNIVERSITY VIOLATED THE PLAINITFF'S RIGHT UNDER TITLE IX, AND THE AMERICANS WITH DISABILITIES ACT 42 U.S.C. § 12101(b) (1988).

- **Failure to provide plaintiff with An Employee Handbook in English or Spanish to inform him of his rights to request reasonable accommodations for his communication disabilities and linguistic discrimination, and harassment by Co-worker Baker who engaged in malicious false accusations of sexual harassment in violation of 42 U.S.C. § 12101(b) (1988) (ADA congressional statement of findings and purposes); *cf. Doe v. Marshall,* 882 F. Supp. 1504, 1507 (E.D.Penn. 1995) (harassment of a plaintiff employed as a janitor by Coworker Baker, on the basis of her disability to conjure up false lies to obtain plaintiff's full time employment position would "fall[] within the ambit" of the ADA and the Rehabilitation Act). Harassment based on disability is no less potent, disruptive, or discriminatory on a university campus or in a classroom than on an assembly line or in a boardroom. *See Franklin v. Gwinnett County Pub. Schs.,* 503 U.S. 60, 74-75, 112 S. Ct. 1028, 1037, 117 L. Ed. 2d 208 (1992);**
- **Failure of Title XI Office or EEO Office to ever provide plaintiff with Employee Handbook to permit plaintiff to educate himself or permit the plaintiff to be allowed to obtain assistance from ADA/504 Coordinator to permit the plaintiff to request DNA, fingerprints, or clothes of accuser Baker to prove, he never placed his hands on him, and that plaintiffs DNA nor fingerprints were never found;**
- **Failure of the defendant Boston University to permit the plaintiff to call his son who was permitted to attend the May 16, 2024, Graduation Ceremony of Boston University to be a witness during Title XI Hearings.**
- **Failure of the Defendant Boston University to permit Plaintiff to call his own Reverand McGillicuddy from his Church and place of worship as a witness.**
- **Failure of Boston University's Human Resources Office officials, to inform their counsel that plaintiff's termination of employment, has been superseded by the decision of Kari Arita of Boston University Human Resources in her email thread between plaintiff's son John De Los Santos dated Friday August 19, 2022 at 8:43 AM, by virtue of coding and categorizing plaintiff's employment as current to be able to award Son John 90% of free tuition;**

- Violation of United States Supreme Court controlling case law decisions, such as <u>Jones v. R.R. Donnelley & Sons Co</u>., 541 U.S. 3679, 124 S.Ct. 1836 1841-1846 (hostile work environment wrongful termination, and failure to transfer claims).
- Violation of 29 U.S. Code § 623 - Prohibition of age discrimination Age Discrimination in Employment Act; by termination of plaintiff due to his age over 62, under the Pretext that he engaged in VERBAL sexual harassment, when his English was in essence unable to be deciphered or understood, and plaintiff only spoke English at all times to his White Caucasian Co-Workers, not Spanish.

**WHEREFORE**, for all the following reasons, based on the totality of circumstances, the plaintiff respectfully requests that this this Honorable Court deny the plaintiff's Motion to Dismiss, pursuant to Rule 12(b)(6), and Motion for Premption; In addition, pursuant to Fed.R.Civ.P. Rule 15(a); and based on the two separately filed Sworn Affidavits of plaintiff Juan De Los Santos, and his son John De Los Santos, setting forth newly discovered facts by Plaintiff, that were previously known by defendant Boston University, the Plaintiff further requests that this Court Strike the Defendant's Motion to Dismiss pursuant to Fed.R.Civ.P. 12(f), and grant him leave to amend his Federal Complaint, pursuant to Fed.R.Civ.R. 15(a).

Respectfully submitted,
Plaintiff Juan De Los Santos
By His Attorney

James E. Neyman

## COMPLIANCE WITH LOCAL RULE 7.1(a)(2)

Pursuant to Local Rule 7.1(a)(2), Plaintiff's counsel certifies that he has conferred with Defendant's counsel on or about Friday, December 20th, to attempt to resolve and/or narrow the issues raises in plaintiff's opposition to Defendant's Motion to Dismiss and/or Request for Leave to Amend pursuant to Fed.R.Civ.P. Rule 15(a).

_____/s/ James E. Neyman_____

James E. Neyman, Esq.(555229)
76 Canal Street, 3rd. Fl.
Boston, MA 02114
james@nwymanandassociaitates.com
617.723.2627

## PROOF OF SERVICE

I, James E. Neyman, as counsel for the plaintiff, Juan De Los Santos, hereby certify that I have served a duplicate Opposition to the defendant's Motion to Dismiss and Motion for leave to file First Amended Complaint upon Counsel for Boston University on this Monday December 23, 2024 via email upon following counsel at Morgan, Brown, & Joy, LLP

Joseph P. McConnell jmcconnell@morganbrown.com
Vineesha S. Sow vsow@morganbrown.com

_/s/ James E. Neyman (555229)
James E. Neyman, Esq.
76 Canal Street
Boston, MA 02114
james@neymananandassocoaites.com
(617) 723.2627

# EXHIBIT "1"



# Qualified tuition reduction

Free or reduced tuition provided by eligible educational institutions to its employees may be excludable from gross income as a qualified tuition reduction. Whether a tuition reduction is a "qualified" tuition reduction and excludable from income depends on whether it is for education below or at the graduate level and whether the tuition reduction represents payment for services.

## IRC Section and Treas. Regulation

- IRC Section 117(d)
- IRC Section 132(h)

## Resources (court cases, Chief Counsel Advice, Revenue Rulings, internal resources)

- IRM Section 4.23.5.15

## Analysis

Generally, amounts paid by an employer to or for the benefit of employees are compensatory in nature, and includible in gross income as wages. However, Section 117(d)(1) of the Internal Revenue Code allows employees of certain educational institutions, including nonprofit universities and colleges, to exclude from gross income qualified undergraduate tuition reduction they, their spouse, or their dependent children receive from the employee's employer.

Section 117(d)(2) defines a "qualified tuition reduction" as the amount of any reduction in tuition provided to any employee of a Section 170(b)(1)(A)(ii) educational organization for the education (below the graduate level) at such organization (or other organization described in Section 170(b)(1)(A)(ii)) of such employee or any person treated as an employee under the rules of Section 132(h). A qualified tuition reduction means that the educational organization pays some or all the tuition for the employee. It may be in the form of tuition remission, a tuition waiver, or a tuition grant.

Section 132(h) provides that the following individuals are considered employees for the purposes of qualified tuition reductions:



- A current employee
- A former employee who retired or left on disability
- A widow or widower of an individual who died while an employee
- A widow or widower of a former employee who retired or left on disability
- A dependent child or spouse of one of the above

Section 170(b)(1)(A)(ii) describes an educational organization as one that normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on.

The exclusion from income provided by Section 117(d) is generally limited to education "below the graduate level." Tuition reductions for graduate education are considered qualified and are excludable only if they are provided by an eligible educational institution to a graduate student performing teaching or research activities for the educational institution. The employee must include in income any other tuition reductions received for graduate education. (IRC Section 117(d)(5)(4))

Section 117(d)(3) of the Code provides that the exclusion from income of a qualified tuition reduction will apply to highly compensated employees only if such reduction is available on substantially the same terms to each member of a group of employees that is defined under a reasonable classification set up by the employer that does not discriminate in favor of highly compensated employees (within the meaning of Section 414(q)).

## Issue indicators or audit tips

### Issue indicators

- Employee Benefits Handbooks
- Employment Contracts
- Written policies and procedures
- Reciprocity Agreements
- Student rosters

### Audit tips

- When discussing fringe benefits with the taxpayer, examiners should communicate with the appropriate parties. Personnel in the payroll department may not have the same awareness of benefits as those in the human resources department.
- Identify the employees receiving tuition reduction, remission, voucher, waiver, etc.
  - Determine employees' job descriptions and amount of the fees waived

*Page Last Reviewed or Updated: 15-Nov-2024*

# EXHIBIT "2"

IN WITNESS WHEREOF, the parties hereto set their hands and seals, by their duly authorized officers or agents, on the day and year first written above.

TRUSTEES OF BOSTON UNIVERSITY

SEIU 32BJ, DISTRICT 615

20

2018-2022

AGREEMENT

Boston University

and

Service

Employees International Union

District 615, 32BJ

CONTENTS

| Article | Title | Page |
|---|---|---|
| | Preamble | 1 |
| 1 | Purpose of Agreement | 1 |
| 2 | Recognition | 1 |
| 3 | Union Membership | 1 |
| 4 | Check-Off | 1 |
| 5 | Seniority | 2 |
| 6 | Management Rights | 2 |
| 7 | Grievances | 3 |
| 8 | Strikes and Lockouts | 3 |
| 9 | Sick Leave, Personal Days, Short Term Disability | 4 |
| 10 | Sympathy Leave | 7 |
| 11 | Jury Duty | 8 |
| 12 | Holidays | 8 |
| 13 | Intersession | 8 |
| 14 | Vacations | 8 |
| 15 | Safety | 10 |
| 16 | Wages and Overtime | 11 |
| 17 | Bulletin Boards | 12 |
| 18 | Promotions and Transfers | 12 |
| 19 | Trial Period | 12 |
| 20 | Scope of Contract | 13 |
| 21 | Anti-Discrimination | 13 |
| 22 | Military Service | 13 |
| 23 | Federal and State Laws and Executive Orders | 13 |
| 24 | Uniforms | 13 |
| 25 | Personnel Files | 14 |
| 26 | Severance Pay | 14 |
| 27 | Training, Apprenticeships, Tuition Remission and Licenses | 14 |
| 28 | Health and Welfare | 15 |
| 29 | Pension Plan | 16 |
| 30 | Miscellaneous | 16 |
| 31 | Employee Identification Badges | 18 |
| 32 | Labor-Management Meetings | 18 |
| 33 | Union Representatives | 19 |
| 34 | Effective Date and Termination | 19 |
| | Schedule A: Schedule of Rates | 21 |
| | Wage Table | 23 |
| | Index Table | 25 |

## ARTICLES OF AGREEMENT

Agreement made this 31st day of October, 2018 by and between Service Employees International Union, District 615, 32BJ (hereinafter referred to as the Union) and the Trustees of Boston University, Boston, Massachusetts (hereinafter referred to as the University).

## ARTICLE 1
### Purpose of Agreement

The purpose of this Agreement is to promote good relations with respect and dignity between the University, the Union and the employees in the bargaining unit represented by the Union, and to make clear the basic provisions upon which such relations depend. It is the intent of the University and the Union to come together to provide and maintain mutually satisfactory terms and conditions of employment, and to prevent as well as adjust misunderstandings or grievances relating to employment.

## ARTICLE 2
### Recognition

**1. Recognition.** The University recognizes the Union as the exclusive bargaining agency for service and maintenance employees of Boston University in the Commonwealth of Massachusetts, as indicated on Schedule A attached hereto and made a part hereof, but excluding the following employees: supervisory employees as defined by the National Labor Relations Act; all student employees; part-time employees who work less than sixteen (16) hours per week; or temporary employees who work less than forty-five (45) days; and all employees directly assigned to academic departments.

**2. Definition.** The term "employee" or "employees" when used in this Agreement shall mean those for whom the Union is recognized as the bargaining representative in accordance with the foregoing paragraph.

**3. Employment of students.** This Agreement does not cover or apply to students attending the University who may at the discretion of the University be employed at any time and from time to time to perform work as a means of earning part of their expenses while studying at the University, and nothing in this Agreement shall restrict the type or amount of work which may be allotted to students.

## ARTICLE 3
### Union Membership

**1. Membership.** Employees covered by this Agreement who are members of the Union on the date of its ratification by the Trustees of Boston University shall, as condition of continued employment, either maintain their membership in the Union or pay to the Union an alternative service fee. Employees who are not union members can object to the use of the payments for certain purposes and are required to pay only their share of union costs relating to collective bargaining, contract administration, and grievance adjustment.

**2. New Hires.** Each new employee hired after the date of this agreement shall within thirty (30) days after the date the employee reports for work, as a condition of employment, either become a member of the Union or pay to the Union an alternative service fee. Employees who are not members of the Union can object to the use of their payments for certain purposes and are required to pay only their share of the union costs relating to collective bargaining, contract administration, and grievance adjustment.

**3. No discrimination.** The Union agrees not to discriminate against any employee. Should the Union fail to admit any future employees to the Union or expel an employee from the Union for any reason other than failure to pay their regular dues and initiation fees, this Article shall not be in operation so far as such employee is concerned.

## ARTICLE 4
### Check-Off

**1. Dues.** The University agrees to deduct monthly, not later than the third payday of each month, from earned wages and remit to the Union, for the duration of this Agreement, Union membership dues fixed in accordance with the Constitution of the Union of all employees of the University covered by this Agreement, who, individually, have requested the University to do so, provided such request is revocable by the employee after one (1) year or upon the termination of this Agreement, whichever is earlier. It is understood and agreed that the check-off of Union dues shall apply to employees who are on a paid vacation at

1

the time Union dues would ordinarily be deducted from wages but shall not apply to employees who work a short working year for the University during the period when such employees are laid off.

**2. American Dream Fund (ADF).** The University agrees to deduct and remit monthly, from earned wages, voluntary contributions authorized by any employees in the bargaining unit, to the S.E.I.U., Local 32 BJ American Dream Fund (ADF). Such contributions are not conditions of membership in the Union or of employment with the University.

## ARTICLE 5
### Seniority

**1. Preference.** The University recognizes the principle of seniority for employees covered by this Agreement, and when qualifications such as ability, training, skill and other relevant qualities are considered equal, then the University will give preference in case of transfer, promotion, layoff and rehiring to employees with the longest service in the occupation concerned. Employees who are transferred by management will be given the reason for the transfer.

**2. Definition.** Seniority shall be defined as an employee's total service in the bargaining unit at Boston University. Seniority shall be frozen for ninety (90) days if the employee is promoted or transferred out of the bargaining unit. Seniority shall determine, on a departmental basis, order of layoff and recall and vacation preference, except that the existing second (2nd), third (3rd), and weekend shifts shall be staffed by a maximum of 8 electricians for the Electric Shop and a combination of plumbers and HVAC mechanics (not to exceed eight (8)) will be used to staff these shifts in the Plumbing and HVAC Shop in a manner to be determined by the University. If the University determines there is a need to augment the staffing levels of these shifts, only employees hired after November 1, 1993 will be used to augment these shifts above and beyond the existing eight (8) person maximum.

   A. Qualified HVAC or Plumbing Shop employees hired before November 1, 1993 may volunteer for these positions.
   B. Coverage for absences from the second (2nd), third (3rd), and weekend shifts will be provided by individuals regularly assigned to these shifts or individuals hired after November 1, 1993.
   C. New hires may be assigned to the day shift for up to two (2) years from their dates of hire or transfer.
   D. The University agrees to establish a joint labor management committee, made up of three (3) representatives from management and three (3) representatives from the union (one (1) from each shop), for the purpose of addressing job-related training needs for the Electrical, HVAC, and Plumbing Shops.

**3. Right to return to former unit.** If an employee is promoted or transferred into a different craft and there is a layoff in that unit, the employee shall be reinstated immediately into their former unit according to seniority.

**4. Termination of rights.** An employee's seniority and employment rights shall be lost under the following circumstances:
   a. Lay-off for a period of nine (9) consecutive months;
   b. Resignation or voluntary quit;
   c. Job abandonment;
   d. Discharge for just cause;
   e. Incarceration for a period of not less than thirty (30) calendar days, regardless of whether it is pre-trial detention or post-conviction imprisonment;
   f. Engaging in gainful employment, during an employee's regularly scheduled shift, while on an approved paid leave of absence;
   g. Overstaying or extending an approved leave of absence without authorization (including statutory leaves of absence, e.g. FMLA);
   h. Five (5) consecutive days of absence without notifying the University, unless there exist verifiable grounds for the absence acceptable to the University;
   i. Failure to return from lay off within seven (7) calendar days of written notice. It shall be incumbent on the University to demonstrate that said notice was delivered.

## ARTICLE 6
### Management Rights

The parties agree that the operation of Boston University, including the supervision of the employees and of their work, is the right of the University. Accordingly, the establishment of reasonable rules to assure orderly and effective work, the determination of what, when and where duties will be performed, the right to lay off employees due to lack of work, the determination of employees' competency, the hiring, transfer, promotion, demotion, layoff, discipline or discharge of employees for just cause, and working schedules, are rights of the University alone, subject to other provisions of this Agreement. The University shall not exercise these rights arbitrarily, capriciously, or in bad faith.

# EXHIBIT "3"

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JUAN DE LOS SANTOS,

    Plaintiff

    v.

TRUSTEES OF BOSTON
UNIVERSITY, and SERVICE
EMPLOYEES INTERNATIONAL
UNION, LOCAL 615 32BJ

    Defendants

No. 23-cv-11305-DJC

## DEFENDANT BOSTON UNIVERSITY'S ANSWER

Co-Defendant Boston University ("Defendant"), by and through its attorneys, answer the allegations contained in Plaintiff Juan De Los Santos's ("Plaintiff's") Amended Complaint against Defendant and Co-Defendant Service Employees International Union, Local 615 32BJ ("Co-Defendant Union) as follows:

The initial paragraph is an introductory paragraph that contains no factual allegation and requires no response. If such a response is required, Defendant denies the allegations in the introductory paragraph.

1.    Defendant is without sufficient information or knowledge to form a belief as to the truth of the allegations contained in paragraph 1, and, accordingly, they are denied.

2.    Upon information and belief, Defendant admits the allegations contained in paragraph 2.

3.    Defendant admits the allegations contained in paragraph 3.

4.    Defendant admits the allegations contained in paragraph 4.

5.    Defendant denies the allegations contained in paragraph 5.

6.    Defendant admits the allegations contained in paragraph 6.

7.    Defendant admits that the complaint was made and processed under its Sexual Misconduct Policy.

8.    Defendant denies the allegations contained in paragraph 8.

9.    Defendant admits the allegations contained in paragraph 9.

10.    Defendant is without sufficient information or knowledge to form a belief as to the truth of the allegations contained in paragraph 10, and, accordingly, they are denied..

11.    Defendant admits the allegations contained in paragraph 11.

12.    Defendant admits the allegations contained in paragraph 12.

13.    Defendant admits that the matter moved forward to binding arbitration.

14.    Defendant admits that the arbitration was presented through a stipulated record.

15.    Defendant denies the allegations contained in paragraph 15.

16.    Defendant denies the allegations contained in paragraph 16.

17.    Defendant denies the allegations contained in paragraph 17.

18.    Defendant denies the allegations contained in paragraph 18.

19.    Defendant denies the allegations contained in paragraph 19.

20.    Defendant denies the allegations contained in paragraph 16.

21.    Defendant neither admits or denies the characterizations contained in paragraph 21, and states that the document speaks for itself.

22.     Defendant neither admits or denies the characterizations contained in paragraph 22, and states that the document speaks for itself.

23.     Defendant neither admits or denies the characterizations contained in paragraph 23, and states that the document speaks for itself.

24.     Defendant is without sufficient information or knowledge to form a belief as to the truth of the allegations contained in paragraph 24, and, accordingly, they are denied.

25.     Defendant denies the allegations contained in paragraph 25.

26.     Defendant denies the allegations contained in paragraph 26.

27.     Defendant denies the allegations contained in paragraph 27.

28.     Defendant denies the allegations contained in paragraph 26.

29.     Defendant is without sufficient information or knowledge to form a belief as to the truth of the allegations contained in paragraph 29, and, accordingly, they are denied.

30.     Defendant is without sufficient information or knowledge to form a belief as to the truth of the allegations contained in paragraph 30, and, accordingly, they are denied.

31.     Defendant denies the allegations contained in paragraph 31.

32.     Defendant denies the allegations contained in paragraph 32.

33.     Defendant denies the allegations contained in paragraph 33.

34.     The paragraph does not state a factual averment and accordingly does not require an admission or denial. To the extent that such a response is required, Defendant denies the allegations contained in paragraph 34.

35.    The paragraph does not state a factual averment and accordingly does not require an admission or denial. To the extent that such a response is required, Defendant denies the allegations contained in paragraph 35.

36.    The paragraph does not state a factual averment and accordingly does not require an admission or denial. To the extent that such a response is required, Defendant denies the allegations contained in paragraph 36.

37.    Defendant denies the allegations contained in paragraph 37.

38.    Defendant denies the allegations contained in paragraph 38.

39.    Defendant denies the allegations contained in paragraph 39.

40.    Defendant denies the allegations contained in paragraph 40.

41.    Defendant denies the allegations contained in paragraph 41.

42.    Defendant denies the allegations contained in paragraph 42.

43.    Defendant denies the allegations contained in paragraph 43.

44.    This paragraph is an allegation brought against Co-Defendant Union and does not require a response by Defendant. To the extent that such a response is required, Defendant denies the allegations contained in paragraph 4.

45.    Defendant denies the allegations contained in paragraph 45.

46.    This paragraph is a demand for a remedy is not a factual averment, so it requires no response. To the extent that a response is required, Defendant denies the allegations contained in paragraph 46.

WHEREFORE Defendant Boston University denies any and all facts not specifically admitted herein and requests that the Court dismiss this matter against it with prejudice.

## AFFIRMATIVE DEFENSES

1.    The Complaint fails to state a claim upon which any relief can be granted.

2.    Plaintiff's claims are barred in whole or in part because they exclusively pertain to matters under the jurisdiction of the National Labor Relations Act and the Labor Management Relations Act and this Court cannot provide the remedy he seeks.

3.    Plaintiff's claims are barred in whole or in part because of the applicable statute of limitations.

4.    All actions regarding Plaintiff's employment were taken for legitimate, non-discriminatory business reasons.

5.    Defendant was required to take all actions it took in this matter because of obligations imposed upon it by Title IX of the Civil Rights Act of 1964, as amended, and regulations promulgated by the U.S. Department of Education thereunder. 20 U.S.C. §1681; 34 CFR §§106.30,106.44,106.45.

6.    Complaint is barred in whole or in part because, at all relevant times, the actions of the Defendant were legal, proper, reasonable, and in conformity with all applicable Massachusetts and federal statutory, regulatory, and decisional law.

7.    Complainant does not have standing to bring this Compliant against Defendant because he cannot prove that Co-Defendant Union failed to fairly represent him in the underlying actions or otherwise act in an arbitrary or capricious manner.

8.    Even if Plaintiff were to prove a violation of the duty of fair representation against Co-Defendant Union, the Complaint otherwise fails because the underlying arbitration award was properly determined and is not subject to being vacated under applicable law.

9.    Plaintiff cannot seek and the Court cannot award the relief requested, but instead could only remand the matter to an arbitral forum for a new hearing.

10.   Defendants reserve their right to add affirmative defenses as they become known.

Respectfully submitted,

MORGAN, BROWN & JOY, LLP
Attorneys for Defendants

__/s/ Joseph P. McConnell__
Joseph P. McConnell (BBO# 566412)
200 State Street, 11th Floor
Boston, MA 02109
(617) 523-6666
jmcconnell@morganbrown.com

Dated:  April 3, 2024

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF),
including counsel for Plaintiff.

/s/ Joseph P. McConnell

# EXHIBIT "4"

**Boston University**
Office of Human Resources
25 Buick Street
Boston, Massachusetts 02215

*www.bu.edu/hr*



September 24, 2007

Juan B. Delos Santos
44 Supple Road
Dorchester, MA  02121

Dear Mr. Delos Santos:

On behalf of the Department of Facilities Management and Planning, I am pleased to
confirm your promotion to Night Custodian, Saturday, September 29, 2007.

Your new base salary is $14.66 per hour.  As you are aware, you must be willing to work
any shift or schedule.  If you work, any evening hour there is a 72-cent-per-hour shift
differential and for night shifts an 83-cent-per-hour shift differential.  Please contact
Jeanne Domenichella your Employee Relations Representative at 617-353-4483 if you
have any further questions.

Please be aware that this position is covered by a collective bargaining agreement.  If you
are *not currently* a member of SEIU Local 615, you have a choice of either joining the
union or paying the Union a service fee in an amount equal to the regular uniformly
required membership dues of the Union (not including fees, fines, assessments, or any
other charges) and as a condition of continued employment, you must make this selection
and begin payments to the Union on or before the 45th day of your employment

It is essential for all new full-time employees to attend our Orientation Program. I will
contact you as soon as I have been able to schedule a private orientation with a Benefits
representative here in Human Resources.  The Orientation meeting will take place at the
Office of Human Resources at 25 Buick Street, 2nd Floor.

Please accept my congratulations on your promotion.  I hope you find your new position
an exciting and rewarding one.

Sincerely,

Wendell M. Graham
Employment and Training Specialist

# New Hire Check List

Employee Name: _Juan Valosaltos_    Hire Date: _09/26/06_

Dept. Name: _Building and Grounds_  Orientation Date  _N/A_

UID: _____    Weekly/Monthly: _Weekly_

| Name | Task | Date Completed |
|---|---|---|
| Nancy/ Meredith Boris | Create New Employee File | _09/27/06_ |
| JoAnn | Assign UID number | |
| | Check Coding, Term dates, Funding | |
| Melissa | Call Dept. Give UID number | |
| Melissa | Key In for Payroll | _10/2/06_ |
| Najma | Verify, employee name label, file I-9 | |
| Benefits | Enter in Benefits File, Patent Policy | |
| | Patent Policy Received | |
| | Enrollment Form Received | |
| Benefits | Employee filed in Active Files | |

# EXHIBIT "5"

# JAMES E. NEYMAN & ASSOCIATES, P.C.
## ATTORNEYS AT LAW
76 Canal Street, Fl 3.
Boston, MA 02114
617.723.2627
Facsimile: 617.723.2608
www.neymanandassociates.com

James E. Neyman, Esq.
James@neymanandassociates.com

February 14, 2022

Carmen Fonseca
26 West Street, 3rd Floor
SEIU 32BJ, District 615
Boston, MA 02111-6150

RE: Juan De Los Santos Arbitration Hearing

Dear Ms. Fonseca:

I am providing this submittal to you as you have refused to let me participate in today's meeting with Juan which follows a continuing pattern by the union and since you refuse to advise who the attorney or members information who are partaking, I ask that you provide them with a copy of this document. I became involved in this case shortly after the adverse decision from BU as to the employment of Juan. Immediately thereafter, I advised Juan to contact the Union re the appeal of the decision and process for filing a grievance. Juan immediately went to the Union office in Boston, within the time frame necessary and referenced the appeal and grievance was told in no uncertain terms that he was all set. This representation was actually false as not only did the Union fail to file an appeal relative to the decision and never told Juan they did not file an appeal until it was too late and had no documentation form the Hearing and asked that I provide them the Hearing documents which I found to be highly unusual. I sent documentation to the Union and am still unaware whether the Union requested anything on its own and if so I am unclear how they could properly prepare for the grievailce, without reviewing the documents in complete detail including the audio version of the proceeding is quite telling as to the lack of credibility of the Complainant and I am quite sure the Union has never listened to the Audio to help prepare, nor have they had an in depth discussion with Juan about the allegations and his version of events and not contacting witnesses who agreed to testify/partake on Juan's behalf, none of which were contacted by the Union. I am also advised by Juan that the focus or pitch of the Union was that Juan was a good worker for many years with no prior complaints. While this may be true, the contention of his work ethic really has no relevance to the behavior alleged which does not appear to have been contested at all. Ms. Perez also refused to speak to me as Juan asked if we could work together and she deliberately sent emails in Spanish so I would not understand them

As to the areas of attack to prevail on this case, we seek to mention the following:

1. In listening to the Complaint's own personal statement, it is obvious he is reading off a script, he shows a flat affect which is quite unusual for someone alleging so many instances of unwanted behavior from my client that would normally produce a far different response

As you are clearly aware, my client is entitled to a Duty of faire representation. I seriously question whether this has been adhered to. An arbitration is the only opportunity to turn this injustice around especially in a case that has serious allegations but is extremely week and not believable. The failure to conduct any investigation or listen to the audio is improper representation which has been a bone of contention since day one. This matter affects Juans life and family. This matter is crying out for an arbitration. If not, I will avail myself to all avenues of redress based on the manner in which this case has been handled.

Sincerely,

ames E. Weyman

# EXHIBIT "6"

# EXHIBIT "7"



**University of Baltimore Law Review**

Volume 46 | Issue 1                                                                                        Article 4

2016

# Protecting Common Law Rights of the Unionized Worker: Demystifying Section 301 Preemption

Phillip Closius
*University of Baltimore School of Law*, pclosius@ubalt.edu

Follow this and additional works at: http://scholarworks.law.ubalt.edu/ublr

Part of the Civil Law Commons, Labor and Employment Law Commons, and the Supreme Court of the United States Commons

Recommended Citation

Closius, Phillip (2016) "Protecting Common Law Rights of the Unionized Worker: Demystifying Section 301 Preemption," *University of Baltimore Law Review*: Vol. 46 : Iss. 1 , Article 4.
Available at: http://scholarworks.law.ubalt.edu/ublr/vol46/iss1/4

This Article is brought to you for free and open access by ScholarWorks@University of Baltimore School of Law. It has been accepted for inclusion in University of Baltimore Law Review by an authorized editor of ScholarWorks@University of Baltimore School of Law. For more information, please contact snolan@ubalt.edu.

# PROTECTING COMMON LAW RIGHTS OF THE UNIONIZED WORKER: DEMYSTIFYING SECTION 301 PREEMPTION

## Phillip J. Closius[*]

## I. INTRODUCTION

Employers are frequently subject to employee lawsuits alleging a tort. Non-unionized employees may seek damages for such conduct by their employers in state court.[1] Unionized employees, however, face the risk that employers will seek to transfer the case to a federal district court in an attempt to immunize tort liability by claiming the complaint is preempted by § 301 of the Labor Management Relations Act of 1947 (LMRA).[2] Although § 301 remains essentially unchanged from the date of its adoption, judicial confusion over the scope of its preemptive effect frequently has broadened an employer's ability to defeat state tort claims by its employees in the early stages of litigation with a motion to dismiss.[3] As a result of this evolution and accompanying confusion, the common law rights of unionized workers have been unfairly circumscribed simply because their union entered into a collective bargaining agreement with their employer.[4] Neither the statute's framers nor the Supreme Court opinions which delineated § 301's impact intended such an expansive result in favor of management. A proper understanding of § 301 and its preemptive effect produces a judicial test which protects the

---

[*]  Professor of Law, University of Baltimore School of Law. A.B. University of Notre Dame (1972); J.D., Columbia (1975). The author wishes to express his appreciation to Merritt Pridgeon, University of Toledo College of Law (2001), and William Sinclair, University of Virginia Law School (2002), for reviewing early drafts of this Article and Jacob Deaven, University of Baltimore School of Law (2016), for assistance with research.
1.  29 U.S.C. § 107 (2012).
2.  Labor Management Relations (Taft-Hartley) Act § 301, 29 U.S.C. § 185(b) (2012).
3.  Some scholars have referred to a "presumption in favor of preemption." Robert M. Sagorian, *A Penalty Flag for Preemption: The NFL Concussion Litigation, Tortious Fraud, and the Steel Curtain Defense of Section 301 of the Labor Management Relations Act*, 35 T. JEFFERSON L. REV. 229, 255 (2013).
4.  *See* Regina Goshorn, *Section 301, Tortious Interference and the Sixth Circuit: Immunization for the Tortfeasor*, 82 U. DET. MERCY L. REV. 253, 277 (2005).

common law rights of unionized workers while still ensuring that collectively bargained agreements will be enforced uniformly throughout the country.

A series of federal statutes regulate labor law in detail. The genesis of this legislation is found in President Franklin Delano Roosevelt's New Deal.[5] Prior to the involvement of Congress in the field, common law courts were often hostile to union activity.[6] The Supreme Court found unions to be illegal combinations in restraint of the labor market and therefore, violative of the Sherman Act.[7] Union members were also personally liable for any damages caused by their union.[8] Harsh working conditions, the economic impact of the Great Depression, and the states' failure to regulate effectively multi-state business entities all contributed to a pro-union political majority in the 1930s.[9] The statutes passed during that era—the Norris-LaGuardia Act of 1932,[10] the National Labor Relations Act of 1935 (often referred to as the "Wagner Act"),[11] and the Fair Labor Standards Act of 1938[12]—form the basis of modern American labor law. The other two bedrock statutes of labor law are the Labor Management Relations Act of 1947 (often referred to as the "Taft-Hartley Act")[13] and the Labor-Management Reporting and Disclosure Act of 1959 (often referred to as the "Landrum-Griffin Act").[14] The political will which produced this statutory framework came from a desire to protect unions and the collective bargaining process, as well as stabilize employee access to a unionized workplace.[15]

---

5.   Richard A. Epstein, *A Common Law for Labor Relations: A Critique of the New Deal Labor Legislation*, 92 YALE L.J. 1357, 1357 (1983).

6.   For use of the doctrine of criminal conspiracy as an anti-union legal doctrine, see Benjamin Levin, *Blue-Collar Crime: Conspiracy, Organized Labor and the Anti-Union Civil Rico Claim*, 75 ALB. L. REV. 559, 577–86 (2012).

7.   *See* Loewe v. Lawlor, 208 U.S. 274, 283, 297 (1908).

8.   *Id.* at 306, 308–09.

9.   *See* Levin, *supra* note 6, at 588–90, 597–601.

10.  Norris-LaGuardia Act, ch. 90, 47 Stat. 70 (1932) (current version at 29 U.S.C. §§ 101–115 (2012)).

11.  National Labor Relations Act, ch. 372, 49 Stat. 449 (1935) (current version at 29 U.S.C. § 151 (2012)).

12.  Fair Labor Standards Act of 1938, ch. 676, 52 Stat. 1060 (1938) (current version at 29 U.S.C. § 201 (2012)).

13.  Labor Management Relations (Taft-Hartley) Act, ch. 120, 61 Stat. 136 (1947) (current version at 29 U.S.C. § 141 (2012)).

14.  Labor-Management Reporting and Disclosure Act of 1959, Pub. L. 86-257, 73 Stat. 519 (1959) (current version at 29 U.S.C. § 401 (2012)).

15.  *See* 29 U.S.C. § 141.

Congress intended that labor relations generally be governed by federal law.[16]  In order to effectuate this goal, federal courts were given explicit jurisdiction over lawsuits involving disputes regarding the meaning of collective bargaining agreements.  Section 301 of the Labor-Management Relations Act of 1947 states:

> (a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.[17]

This statutory provision therefore expressly permits plaintiffs to file a contract claim in federal court and defendants to remove a contract claim originally filed in state court to federal court.

The Supreme Court has interpreted § 301 to be more than simply a statute granting jurisdiction.[18]    The Court has held that the substantive meaning of § 301 directs federal courts to create a body of national law for the enforcement of collective bargaining agreements and the promise to arbitrate grievances found therein.[19] Therefore, the Court also has held that § 301 preempts any state lawsuit alleging a contractual breach of a collective bargaining agreement.  However, in order to protect exclusive federal control over the meaning of such collective agreements, the Court also has held that state tort lawsuits, which were in fact contract claims, must also be preempted.[20]  This expanded preemptive effect of § 301 has led to confusion as judges have struggled to distinguish "real" tort claims from "disguised" tort claims that are actually contract claims

---

16.    *See id.*
17.    Labor Management Relations (Taft-Hartley) Act, ch. 120, § 301(a), 61 Stat. 136, 156–57 (1947) (current version at 29 U.S.C. § 185(a) (2012)).  Section 301(b) provides, among other things, that a labor union may sue or be sued as an entity in federal court and that any money judgments against a union shall be enforceable only against the union as an entity and its assets, not the assets of its individual members. *Id.* at § 301(b).

18.    Textile Workers Union v. Lincoln Mills of Ala., 353 U.S. 448, 450–51 (1957).
19.    *Id.*
20.    Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 213 (1985).

for breach of a collective bargaining agreement.[21] The lack of clarity has been exacerbated by the failure of some judges to distinguish between the substantive attributes of § 301 labor law and the requirements for preempting state law.[22] Some courts have avoided a detailed preemptive analysis by citing the importance of arbitration in labor law and simply expanding the preemptive scope of § 301.[23] This judicial trend has unfairly limited the common law rights of unionized workers and has extended the reach of § 301 into disputes that were never intended to be federalized.

This Article asserts that the Supreme Court has delineated the preemptive effect of § 301 with more clarity than many lower courts realize. Part II of this Article examines Supreme Court cases and preemptive principles contained therein.  Part III analyzes the accepted principles that have arisen from application of those Supreme Court opinions by lower courts. Part IV discusses the main areas of confusion that still exist as lower courts seek to define § 301 preemption. Part IV also offers proposals to distinguish more clearly state tort claims which are truly based on traditional common law principles from tort claims that are actually disagreements over terms of a collective bargaining agreement.

## II. THE SUPREME COURT CASES

The Supreme Court first dealt with the meaning of § 301 in the seminal case of *Textile Workers Union of America v. Lincoln Mills of Alabama*.[24]  In that case, the union and the company executed a collective bargaining agreement which provided that there would be no strikes or work stoppages in exchange for a grievance procedure that involved good faith negotiation and, if that failed, arbitration.[25] The union filed grievances regarding workloads and work assignments.[26] When negotiations failed, the union requested the agreed upon arbitration, and the employer refused.[27] The union then filed a lawsuit in federal court to compel arbitration.[28]  The Court

---

21.    *See* McCormick v. AT&T Techs., Inc., 934 F.2d 531, 539 (4th Cir. 1991) (Phillips, J., dissenting).
22.    *See infra* notes 216–20 and accompanying text.
23.    *See infra* notes 218–20 and accompanying text.
24.    353 U.S. 448 (1957).
25.    *Id.* at 449.
26.    *Id.*
27.    *Id.*
28.    *Id.*

held that "§ 301(a) is more than jurisdictional—that it authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements and includes within that federal law specific performance of promises to arbitrate grievances under collective bargaining agreements."[29] The opinion further noted that the law to be applied was "federal law, which the courts must fashion from the policy of our national labor laws."[30] Since the union had given up the right to strike in exchange for the arbitration clause, the national policy favoring labor peace dictated that either side of the collective bargaining agreement have access to the full powers of the federal courts to enforce the clear terms of the contract.[31] The result in favor of the union was consistent with the dictates of federal labor policy as revealed in the legislative history of § 301.[32] Therefore, while *Lincoln Mills* did not deal directly with the issue of the preemption of state law, the opinion is noteworthy for its holding that substantive federal common law would govern lawsuits for which § 301 provided federal jurisdiction.

The Supreme Court reiterated the principles of *Lincoln Mills* in its next major § 301 decision, *Local 174 v. Lucas Flour Co.*[33] The applicable collective bargaining agreement provided that the employer could discharge any worker if his work was not satisfactory.[34] The agreement also contained a binding arbitration clause for resolving any differences in the true interpretation of the contract.[35] Lucas Flour discharged an employee for unsatisfactory work.[36] In response, the union went on strike for eight days.[37] After the strike ended, the issue was submitted to arbitration as prescribed in the agreement, and the arbitration panel eventually held that the employee was validly fired.[38] Lucas Flour thereafter filed a state lawsuit against the union seeking monetary damages for business

---

29.     *Id.* at 450–51.
30.     *Id.* at 456.
31.     *Id.* at 455.
32.     *Id.* at 453–56.
33.     369 U.S. 95 (1962).
34.     *Id.* at 96.
35.     *Id.*
36.     *Id.* at 97.
37.     *Id.*
38.     *Id.*

losses caused by the strike.[39]   The state court awarded damages against the union in the amount of $6,501.60.[40]

The Court upheld the damage award against the union, but only because the strike was a breach of the agreement under federal, not state law.[41]   Section 301 depended upon a substantive federal labor law in order to provide interpretive uniformity of all collective bargaining agreements:

> The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might someday be invoked in enforcing the contract.[42]

The holdings in *Lincoln Mills* and *Lucas Flour*—that § 301 implied a preemptive, substantive federal labor law—was not controversial in the fact patterns of those cases.   Such a result was necessary to effectuate the recognized national labor policy of encouraging the peaceful resolution of management-labor disagreements through collective bargaining. State law was preempted only in the context of lawsuits between an employer and a union to enforce explicit provisions of a relevant collective bargaining agreement. Therefore, the two cases that created § 301 preemption applied it narrowly.

The Court next dealt with the issue twenty-three years later in *Allis-Chalmers Corp. v. Lueck*.[43]   The fact pattern at issue provided the basis for expanding the scope of § 301 preemption beyond the holdings of *Lincoln Mills* and *Lucas Flour*. *Lueck* was not a dispute between an employer and a union; rather, an employee filed the complaint alleging a tort against his employer.[44]   The collective bargaining agreement at issue detailed a disability plan which

39.   *Id.*
40.   *Id.*
41.   *Id.* at 104.
42.   *Id.* at 103.
43.   471 U.S. 202 (1985).
44.   *Id.* at 206.

provided benefits for non-occupational injuries to employees.[45] The agreement also contained a grievance procedure which culminated in binding arbitration.[46] After suffering a non-occupational back injury, Lueck filed a claim under the disability plan and won an award pursuant to it.[47] Lueck later believed that Allis-Chalmers was trying to avoid paying the award in full by not making payments, delaying payments, or insisting that he see various doctors to reconfirm the extent of his injury.[48] However, instead of filing a second grievance under the collective bargaining agreement, he filed a lawsuit in Wisconsin state court alleging that Allis-Chalmers had processed his claim in bad faith, a tort under state law.[49] The issue, therefore, was whether § 301 preempted Lueck's state-law claim.[50]

The Supreme Court began its analysis by citing *Lucas Flour* for the principle that "[a] state rule that purports to define the meaning or scope of a term in a contract suit therefore is pre-empted by federal labor law."[51] The opinion then significantly expanded the reach of § 301 by noting that, in order to effectuate the national policies at stake, certain state tort lawsuits would be preempted in addition to those alleging breaches of contract:

> The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort.[52]

However, the Court was equally clear that not all tort suits were proscribed by § 301:

---

45.    *Id.* at 214.
46.    *Id.* at 204.
47.    *Id.* at 205.
48.    *Id.*
49.    *Id.* at 206.
50.    *Id.* at 206–08.
51.    *Id.* at 210.
52.    *Id.* at 211.

> Nor is there any suggestion that Congress, in adopting §
> 301, wished to give the substantive provisions of private
> agreements the force of federal law, ousting any inconsistent
> state regulation. Such a rule of law would delegate to
> unions and unionized employers the power to exempt
> themselves from whatever state labor standards they
> disfavored. Clearly, § 301 does not grant the parties to a
> collective-bargaining agreement the ability to contract for
> what is illegal under state law. In extending the pre-emptive
> effect of § 301 beyond suits for breach of contract, it would
> be inconsistent with congressional intent under that section
> to preempt state rules that proscribe conduct, or establish
> rights and obligations, independent of a labor contract.[53]

The Court specifically noted in a footnote that preemption was not
appropriate simply because a state tort lawsuit contained a claim that
was a mandatory subject of collective bargaining.[54] The opinion then
stated the appropriate test for determining the extent of § 301
preemption:

> Our analysis must focus, then, on whether the Wisconsin
> tort action for breach of the duty of good faith as applied
> here confers nonnegotiable state-law rights on employers or
> employees independent of any right established by contract,
> or, instead, whether evaluation of the tort claim is
> inextricably intertwined with consideration of the terms of
> the labor contract. If the state tort law purports to define the
> meaning of the contract relationship, that law is pre-
> empted.[55]

The Court concluded that Lueck's claim was preempted pursuant to
this test. The key to the state claim was the interpretation of the
phrase "good faith."[56] That concept was not independently defined
by state law, but was necessarily related to the duty or obligation
imposed on Allis-Chalmers by the terms and conditions of the
contract.[57] The Court stated, "Because the right asserted not only
derives from the contract, but is defined by the contractual obligation
of good faith, any attempt to assess liability here inevitably will

---

53.    *Id.* at 211–12 (footnote omitted).
54.    *Id.* at 212 n.7.
55.    *Id.* at 213.
56.    *Id.* at 215.
57.    *Id.* at 217.

involve contract interpretation."[58]  Since Lueck's claim could have been pled as a contract claim, his lawsuit was properly preempted. The opinion further noted that an additional reason for preempting Lueck's state-law tort claim was the national policy of encouraging arbitration.[59]   The Court stated, "The need to preserve the effectiveness of arbitration was one of the central reasons that underlay the Court's holding in *Lucas Flour*."[60]

The Court concluded by emphasizing the narrow focus of its holding: "Nor do we hold that every state-law suit asserting a right that relates in some way to a provision in a collective-bargaining agreement, or more generally to the parties to such an agreement, necessarily is pre-empted by § 301."[61]  The inquiry must necessarily proceed on a case-by-case basis.   Since Lueck's claim was "substantially dependent" upon an analysis of a provision in a collective bargaining agreement, the lawsuit must be treated as a labor claim under § 301 (and consequently dismissed for failure to use the grievance procedure) or dismissed as preempted by federal labor-contract law pursuant to § 301.[62]

The Supreme Court expanded its understanding of § 301 preemption in *International Brotherhood of Electrical Workers v. Hechler*.[63]  Hechler was a union member and electrical apprentice employed by Florida Power and Light Company.[64]  She was injured when she came into contact with highly energized equipment at her workplace.[65]  Hechler sued her union for damages related to her injuries, alleging the union had assumed a duty to ensure that she was provided with a safe workplace.[66]  After the union removed the case to federal court, Hechler conceded that the union's duty was created solely by its collective bargaining agreement negotiated with Florida Power.[67]  In spite of that admission, the Eleventh Circuit reversed the District Court's holding that the lawsuit was preempted by § 301.[68] The Court of Appeals ruled that, even if the duty was created by the

---

58.    *Id.* at 218.
59.    *Id.* at 219.
60.    *Id.*
61.    *Id.* at 220.
62.    *Id.*
63.    481 U.S. 851 (1987).
64.    *Id.* at 853.
65.    *Id.*
66.    *Id.*
67.    *Id.* at 854.
68.    *Id.*

collective bargaining agreement, the union's liability would be assessed on traditional state negligence principles.[69]

The Supreme Court reversed the Eleventh Circuit by holding that Hechler had effectively alleged a "tortious breach-of-contract claim" that was preempted by § 301.[70] The Court had earlier noted that "[t]he ordinary § 301 case is a contract claim in which the collective-bargaining agreement expressly asserts that a provision of the agreement has been violated."[71] Although the parties in the case at bar were not an employer and a union, the same reasoning applied to a lawsuit by a worker against her union when the collective bargaining agreement created the duty:

> In order to determine the Union's tort liability, however, a court would have to ascertain, first, whether the collective-bargaining agreement in fact placed an implied duty of care on the Union to ensure that Hechler was provided a safe workplace, and, second, the nature and scope of that duty, that is, whether, and to what extent, the Union's duty extended to the particular responsibilities alleged by respondent in her complaint. Thus, in this case, as in *Allis-Chalmers*, it is clear that "questions of contract interpretation . . . underlie any finding of tort liability."[72]

The Supreme Court earlier noted that the resolution of § 301 preemption would be different if Hechler's lawsuit was against Florida Power: "Under the common law, however, it is the *employer*, not a labor union, that owes employees a duty to exercise reasonable care in providing a safe workplace."[73] The common law tort would impose a duty on an employer, which would be independent of a collective bargaining agreement.[74] Since the union had no equivalent common law responsibility, its duty could originate only from the agreement.[75] Hechler's tort lawsuit was therefore dependent on contract interpretation.[76]

---

69.   *Id.* at 855.
70.   *Id.* at 861, 865.
71.   *Id.* at 857.
72.   *Id.* at 862 (quoting Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 218 (1985)).
73.   *Id.* at 859.
74.   *Id.*
75.   *Id.* at 862.
76.   *Id.*

*Caterpillar Inc. v. Williams*[77] emphasized that a plaintiff's complaint alone must be the basis for evaluating a § 301 preemption claim. In *Williams*, several employees began their employment with Caterpillar as union workers subject to a collective bargaining agreement.[78] Eventually, they each were promoted to managerial or weekly salaried employees, which were non-unionized positions outside the scope of the agreement.[79] According to these employees, Caterpillar's management consistently assured them that, if the plant ever closed, they would have jobs in other Caterpillar facilities.[80] These employees were later returned to their hourly unionized positions, subject to the collective bargaining agreement.[81] Caterpillar eventually closed the plant and laid off this group of employees.[82] The former employees then filed a lawsuit in state court alleging breach of their employment promises and the contract that resulted therefrom.[83] Caterpillar removed the case to federal court and asserted § 301 preemption.[84]

The Supreme Court affirmed the Ninth Circuit's holding that the lawsuit was not preempted by § 301.[85] The Court began its analysis by stating that prior cases had established a two-part test for § 301 preemption: "Section 301 governs claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.'"[86] However, the test must focus on the allegations contained in a plaintiff's complaint, not on a defense mounted by an employer:

> Caterpillar impermissibly attempts to create the prerequisites to removal by ignoring the set of facts (i.e., the individual employment contracts) presented by respondents, along with their legal characterization of those facts, and arguing that there are different facts respondents might have alleged that would have constituted a federal claim. In sum,

---

77.    482 U.S. 386 (1987).
78.    *Id.* at 388.
79.    *Id.*
80.    *Id.* at 389.
81.    *Id.*
82.    *Id.*
83.    *Id.* at 390.
84.    *Id.*
85.    *Id.* at 399.
86.    *Id.* at 394 (quoting Int'l Bhd. of Elec. Workers v. Hechler, 481 U.S. 851, 859 n.3 (1987)).

Caterpillar does not seek to point out that the contract relied upon by respondents is in fact a collective agreement; rather it attempts to justify removal on the basis of facts not alleged in the complaint.[87]

The Court emphasized the importance of the complaint as the touchstone for § 301 preemption in its conclusion:

> But the presence of a federal question, even a § 301 question, in a defensive argument does not overcome the paramount policies embodied in the well-pleaded complaint rule – that the plaintiff is the master of the complaint, that a federal question must appear on the face of the complaint, and that the plaintiff may, by eschewing claims based on federal law, choose to have the cause heard in state court. When a plaintiff invokes a right created by a collective-bargaining agreement, the plaintiff has chosen to plead what we have held must be regarded as a federal claim, and removal is at the defendant's option. But a defendant cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law, thereby selecting the forum in which the claim shall be litigated. If a defendant could do so, the plaintiff would be master of nothing.[88]

Plaintiffs' claims for breach of an oral contract were not created by, or dependent on, the collective bargaining agreement. The existence of provisions in the bargaining agreement which dealt with termination of employees and Caterpillar's duty to reassign laid off workers were not determinative of § 301 preemption since the complaint was not based on, nor made reference to, such provisions.[89] The existence of the oral contracts and their breach were therefore properly resolved by state, not federal, law.

The Supreme Court clarified the relationship between § 301 preemption and the existence of a grievance process in its next decision, *Lingle v. Norge Division of Magic Chef, Inc.*[90] In analyzing *Lingle*, it is important to note that the *Lueck* opinion stated that the holding in *Lucas Flour* was based in significant part on preserving

---

87. *Id.* at 396–97 (emphasis omitted).
88. *Id.* at 398–99 (emphases omitted) (footnote omitted).
89. *Id.* at 394–95.
90. 486 U.S. 399 (1988).

the effectiveness of arbitration.[91]  Lingle was injured on the job and requested compensation for her medical expenses from Norge consistent with Illinois workers' compensation law.[92]  Norge thereafter discharged her for filing a "false" workers' compensation claim.[93]  The applicable collective bargaining agreement contained provisions protecting unionized workers from discharge except for "proper" or "just" cause.[94]  Lingle's union promptly filed a grievance on her behalf pursuant to the process detailed in the agreement.[95]  An arbitrator eventually ruled in Lingle's favor, and she received reinstatement with full back pay.[96]  After the grievance was filed, Lingle also filed a lawsuit in state court alleging that Norge had fired her in retaliation for exercising her rights under Illinois law.[97]  Norge removed the case to federal court and moved to dismiss based on § 301 preemption.[98]  The District Court granted Norge's motion and the Court of Appeals affirmed the dismissal of Lingle's complaint.[99]

The Supreme Court reversed the Seventh Circuit and held that Lingle's state lawsuit was not preempted by § 301 despite the concurrent grievance filing.[100]  The Court noted that the facts of retaliatory discharge did not involve the interpretation of a provision in the collective bargaining agreement, but instead focused on "the conduct of the employee and the conduct and motivation of the employer."[101]  Accordingly, "the state-law remedy in this case is 'independent' of the collective-bargaining agreement in the sense of 'independent' that matters for § 301 pre-emption purposes: resolution of the state-law claim does not require construing the collective-bargaining agreement."[102]

The Court of Appeals decided to preempt because the state court would be resolving the same facts and deciding the same issue as the arbitrator—whether there was just cause to fire Lingle.  The Court expressly rejected that analytical similarity as the basis for § 301 preemption:

91.   *See supra* notes 59–60 and accompanying text.
92.   *Lingle*, 486 U.S. at 401.
93.   *Id.*
94.   *Id.*
95.   *Id.*
96.   *Id.* at 402.
97.   *Id.*
98.   *Id.*
99.   *Id.*
100.  *Id.* at 413.
101.  *Id.* at 407.
102.  *Id.*

> [Section] 301 pre-emption merely ensures that federal law
> will be the basis for interpreting collective-bargaining
> agreements, and says nothing about the substantive rights a
> State may provide to workers when adjudication of those
> rights does not depend upon the interpretation of such
> agreements. In other words, even if dispute resolution
> pursuant to a collective-bargaining agreement, on the one
> hand, and state law, on the other, would require addressing
> precisely the same set of facts, as long as the state-law claim
> can be resolved without interpreting the agreement itself, the
> claim is "independent" of the agreement for § 301 pre-
> emption purposes.[103]

The Supreme Court therefore held that the existence of a grievance or
arbitration process in an applicable collective bargaining agreement
was not relevant in a § 301 preemption analysis. While preserving
the efficacy of arbitration factored into the development of federal
common law under § 301, preemption under that statutory provision
focused on the need to interpret a term of the collective bargaining
agreement in order to resolve the complaint.

The case *United Steelworkers v. Rawson*[104] presented the Court
with a state tort claim brought by the survivors of four employees
against their union. The workers were miners who were killed in an
underground fire that occurred at the Sunshine Mine in Kellogg,
Idaho.[105] The "complaint alleged that the miners' deaths were caused
by [the] fraudulent and negligent acts" of the union.[106] The
applicable collective bargaining agreement had established a joint
management-labor safety committee to make the mines safer for
workers.[107] Plaintiffs alleged that the union had inadequately
prepared its investigators and, as a result, negligently performed
inspections that failed to detect obvious flaws in the mines.[108] The
Court cited *Hechler* in holding that the basis of the state tort alleged
in the complaint—the union's duty to inspect the mines—was created
and defined by the collective bargaining agreement.[109] Since the
union did not have a common law duty to provide a safe workplace,
the complaint could not allege that the union violated the independent

---

103. *Id.* at 409–10 (footnote omitted).
104. 495 U.S. 362 (1990).
105. *Id.* at 364.
106. *Id.*
107. *Id.* at 365.
108. *Id.* at 364–65.
109. *Id.* at 370.

duty of reasonable care owed to every person in society.[110] Therefore, the Plaintiffs' complaint was preempted under § 301.[111]

The most recent Supreme Court case of significance regarding § 301 preemption is *Livadas v. Bradshaw*.[112] Livadas was a grocery store clerk at Safeway until her discharge.[113] Her collective bargaining agreement explicitly provided that all disputes relating to unjust discharge would be subject to binding arbitration.[114] California state law required that all discharged workers be paid the wages owed to them immediately.[115] When Livadas was fired on January 2, 1990, she demanded her wages immediately.[116] Her manager refused to pay her, stating that company policy was to mail her a check from a central location.[117] She received the check on January 5, 1990 for all wages due to her through January 2, 1990.[118] She then filed a claim against Safeway with the California Division of Labor Standards Enforcement, demanding three days' wages to compensate for the delay.[119] The Commissioner refused her claim, relying on a policy that statutory wage claims were not available to workers covered by collective bargaining agreements.[120] Livadas filed a lawsuit in federal District Court to enforce payment of her claim.[121]

The Commissioner argued that § 301 preempted her from paying Livadas on her claim since the determination of the amount she would be owed would depend on the collective bargaining agreement, and federal labor policy favored arbitration to resolve these types of grievances.[122] The Supreme Court disagreed and held that § 301 did not preempt Livadas' claim:

---

110.    *Id.* at 371. The Court cited *Hechler*, again noting that the situation would be different if the lawsuit had been brought against an employer who possesses a common law duty to provide a safe workplace. *Id.* at 374.
111.    *Id.* at 372. The Court also held that, pursuant to § 301 federal common law, mere negligence was not enough for the union to violate its duty of fair representation to its members. *Id.* at 372–73.
112.    512 U.S. 107 (1994).
113.    *Id.* at 110.
114.    *Id.*
115.    *Id.*
116.    *Id.* at 111.
117.    *Id.*
118.    *Id.*
119.    *Id.*
120.    *Id.* at 112–13.
121.    *Id.* at 113–14.
122.    *Id.* at 121.

> In *Lueck* and in *Lingle* . . . we underscored the point that §
> 301 cannot be read broadly to pre-empt nonnegotiable rights
> conferred on individual employees as a matter of state law,
> and we stressed that it is the legal character of a claim, as
> "independent" of rights under the collective-bargaining
> agreement . . . that decides whether a state cause of action
> may go forward. Finally, we were clear that when the
> meaning of contract terms is not the subject of dispute, the
> bare fact that a collective-bargaining agreement will be
> consulted in the course of state-law litigation plainly does
> not require the claim to be extinguished.[123]

The only issue in the case—whether Safeway willfully failed to pay
Livadas' wages promptly on severance—was strictly a question of
state law independent of the bargaining agreement.[124] Preemption
was not supported because the collective bargaining agreement
needed to be referenced in order to determine Livadas' wage and
therefore her damages.[125] The opinion concluded by noting that §
301 and other federal labor laws should not be interpreted to deny
union workers state-law rights granted to all non-union workers,
especially in the absence of clear and explicit language waiving the
right if state law permits such a waiver.[126]

*Williams*, *Lingle*, and *Livadas* all held that the employee's claims
were not preempted. These three opinions reflect the Supreme
Court's belief that many of the lower courts had been reading § 301
preemption too broadly. After those decisions, a number of circuits
revisited their preemption decisions and revised them to conform to
Supreme Court precedent.[127]

## III. PREEMPTION CLARITY

Although the Supreme Court cases appear to establish clear rules
for the interpretation of § 301 preemption, lower federal courts
occasionally have struggled to apply them to a wider range of fact
patterns. The Ninth Circuit, in *Cramer v. Consolidated
Freightways*,[128] noted the difficulty of the task in determining the
extent of § 301 preemption:

---

123. *Id.* at 123–24 (footnotes omitted).
124. *Id.* at 124–25.
125. *Id.* at 125.
126. *Id.* at 128–33.
127. *See infra* Part III.
128. 255 F.3d 683 (9th Cir. 2001).

The demarcation between preempted claims and those that survive § 301's reach is not, however, a line that lends itself to analytical precision. As the Supreme Court acknowledged in *Livadas*, "[T]he Courts of Appeals have not been entirely uniform in their understanding and application of the principles set down in *Lingle* and [*Allis-Chalmers*]." And little wonder. "Substantial dependence" on a CBA is an inexact concept, turning on the specific facts of each case, and the distinction between "looking to" a CBA and "interpreting" it is not always clear or amenable to a bright-line test.[129]

Other circuits have noted the difficulties inherent in § 301 inquiry.[130] However, the case law has in fact developed a number of accepted black letter law principles in the preemptive analysis.[131]

The Supreme Court in *Williams* noted that preemption was appropriate when a claim was premised on rights directly created by a collective bargaining agreement or substantially dependent on an analysis of a collective bargaining agreement.[132] A two-part test has emerged from the application of this language:

1) Is the right (or corresponding duty) alleged by the plaintiff *only* (or solely) created by the applicable collective bargaining agreement?; and

2) Is any element of the state-law claim alleged by the plaintiff substantially dependent on the interpretation of a term or provision contained in the applicable collective bargaining agreement for its resolution?[133]

---

129.  *Id.* at 691 (citation omitted).
130.  McCormick v. AT&T Techs., Inc., 934 F.2d 531, 539 (4th Cir. 1991); *see also* Michael Telis, *Playing Through the Haze: The NFL Concussion Litigation and Section 301 Preemption*, 102 GEO. L.J. 1841, 1854–55 (2014).
131.  The circuit courts of appeals were more willing to preempt state-law claims before the clarifying Supreme Court decisions of *Williams*, *Lingle*, *Rawson*, and *Livadas*. Both the Third and the Ninth Circuits have explicitly overruled earlier cases as being inconsistent with these later Supreme Court decisions. *See* Kline v. Sec. Guards, Inc., 386 F.3d 246, 258–59 (3d Cir. 2004); *see also* Cramer, 255 F.3d at 692–93 (9th Cir. 2001).
132.  *See supra* notes 77–89 and accompanying text.
133.  *See* Brown v. Pro Football, Inc., 518 U.S. 231, 265 (1996); Williams v. NFL, 582 F.3d 863, 874 (8th Cir. 2009); Alongi v. Ford Motor Co., 386 F.3d 716, 724 (6th Cir. 2004); Goshorn, *supra* note 4, at 264–65; Telis, *supra* note 130, at 1849. The word "only" is properly added to the creation of the right or duty because the Supreme Court held in *Lingle* that if a right is created by both state law and the collective

If the answer to both questions is no, then the complaint should not be preempted. If the answer to either or both questions is yes, then § 301 preemption is appropriate and the matter should be resolved by substantive federal labor law. Both questions must be resolved solely by an examination of the plaintiff's complaint.[134] The defendant's defensive assertions may not be considered in the resolution of the preemptive questions.[135]

The first prong of this test is the easiest to apply. The complaint on its face or by necessity must allege a right or duty that is only found in a collective bargaining agreement. This requirement is derived from the Supreme Court's opinions in *Hechler* and *Rawson*. In both of those cases, the defendant was a union.[136] Because unions were not recognized at common law as full legal entities and are mainly creatures of federal statutory law, they historically have not been subject to common law duties.[137] In fact, both opinions noted that the respective employers, not the unions, had the independent common law duty of reasonable care to maintain a safe workplace owed to every member of society.[138] The lawsuit, therefore, would not have been preempted if brought against the employer. However, the union's lack of common law duty meant that the right asserted by the plaintiffs was necessarily created and defined by the collective bargaining agreement.[139] Therefore, preemption was appropriate since the right and corresponding duty were solely created by contract, not state common law or statutory law.

In a lawsuit against an employer, preemption under this first test also applies to any complaint which—explicitly or by necessary implication—alleges rights that originate only from a collective bargaining agreement. In *Foy v. Pratt & Whitney Group*,[140] the Second Circuit stated that preemption was appropriate if a complaint

---

bargaining agreement, then the plaintiff is not limited simply to the agreement and therefore not preempted. Burnside v. Kiewit Pac. Corp., 491 F.3d 1053, 1059 (9th Cir. 2007); Humble v. Boeing Co., 305 F.3d 1004, 1009 (9th Cir. 2002); Sagerian, *supra* note 3, at 252.

134.    *Alongi*, 386 F.3d at 727; *see also* Caterpillar Inc. v. Williams, 482 U.S. 386, 397 (1987).

135.    Humphrey v. Sequentia, Inc., 58 F.3d 1238, 1244 (8th Cir. 1995); *see also Williams*, 482 U.S. at 397.

136.    United Steelworkers v. Rawson, 495 U.S. 362, 364 (1990); Int'l Bhd. of Elec. Workers v. Hechler, 481 U.S. 851, 853 (1987).

137.    *Rawson*, 495 U.S. at 369; *Hechler*, 481 U.S. at 859.

138.    *Rawson*, 495 U.S. at 371; *Hechler*, 481 U.S. at 859.

139.    *Rawson*, 495 U.S. at 370; *Hechler*, 481 U.S. at 862. *Hechler* had in fact explicitly conceded that the duty came only from the CBA. *Hechler*, 481 U.S. at 854.

140.    127 F.3d 229 (2d Cir. 1997).

alleging a state common law "tort premised on the violation of duties in the CBA."[141]   Former employees in *Foy*, however, alleged that their employer made intentional or negligent misrepresentations to them that violated state statutory and common law.[142]  Foy claimed that her employer promised that she would be given an opportunity to transfer to another factory prior to any layoff at her current factory.[143] She was laid off without such an opportunity as permitted by the terms of her collective bargaining agreement.[144]   The Second Circuit held that Foy's complaint was not preempted because she alleged independent state-law rights and did not reference any collective bargaining agreement: "State law—not the CBA—is the source of the rights asserted by plaintiffs: the right to be free of economic harm caused by misrepresentation."[145]   In *Cephas v. MVM, Inc.*,[146] the District of Columbia Circuit preempted a state-law-based complaint by an employee against his employer alleging that the employer had transferred him in violation of its collective bargaining agreement.[147] However, Cephas's lawsuit was properly preempted because "[n]either his complaint nor his brief, however, identifies any source of right—such as an individual employment agreement—other than the CBA."[148]   Accordingly, Cephas's only recourse was a suit pursuant to the substantive federal labor law contained in § 301.[149]

The first part of this test is therefore clear in its application.  If the defendant in a common law tort suit brought by an employee is a union, *Hechler* and *Rawson* effectively hold that most common law claims will be preempted.  If the defendant in such a case is an employer, and the complaint makes no reference to a collective bargaining agreement but relies solely on state law, the claim will not be preempted pursuant to this part of the test.  A plausible argument that the right or duty at issue is not exclusively derived from a collective bargaining agreement (but can be grounded on independent state grounds) should satisfy this portion of the preemption analysis.

The limited nature of the first part of the § 301 preemption test, however, means that the second prong is the one more frequently in

---

141.   *Id.* at 235.
142.   *Id.* at 232.
143.   *Id.* at 231.
144.   *Id.*
145.   *Id.* at 235.
146.   520 F.3d 480 (D.C. Cir. 2008).
147.   *Id.* at 482.
148.   *Id.* at 484.
149.   *Id.*  The court also held that such a § 301 action was not precluded by the applicable statute of limitations and could therefore proceed in the district court. *Id.* at 490.

UNIVERSITY OF BALTIMORE LAW REVIEW    Vol. 46

dispute and, therefore, more difficult to apply. Preemption of claims that are substantially dependent on the interpretation of a term in a collective bargaining agreement is required to enforce the policy against enforcement of tort claims that are simply cleverly disguised contract disputes.[150] Interpretive preemption was created by *Lueck*. The employee in that case alleged that his employer had violated a state-law duty to process his disability claim in good faith.[151] Accordingly, the right or duty was not created solely by the collective bargaining agreement but had an independent basis in state law. The Court therefore could not use the first part of the preemption test as defined herein. However, the opinion noted that the state law at issue did not define "good faith"; that determination was a case by case inquiry of the applicable standards contained within the collective bargaining agreement.[152] Thus, the complaint was preempted because the definition of the state-law claim necessarily required an interpretation of "good faith" as detailed in the collective bargaining agreement.[153] The need for uniformity in the meaning of terms in collective bargaining agreements dictated that terms be defined by federal, not state, law.[154] The agreement provided in detail the meaning of "good faith" in the processing of disability claims.[155]

The *Lueck* result has been the source of confusion as lower courts struggle with the issue of whether traditional tort concepts such as "reasonable," "outrageous," or "reliance" are as vague as "good faith," consequently requiring interpretation of the collective bargaining agreement for their definitions. However, some parts of the analysis are clear: *Lueck* holds that not all claims related to the workplace must be resolved by federal law, and preemption does not occur simply because the lawsuit arises from a mandatory subject of collective bargaining.[156] The circuits have applied this concept to mean that preemption cannot occur simply because the general subject of the complaint is covered by a collective bargaining agreement; defendant must show that the elements of the complaint are substantially dependent on a specific provision of the agreement.[157] *Lueck* also explicitly states that a complaint alleging conduct by a defendant that is illegal under state law may not be

---

150. Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 211 (1985).
151. *Id.* at 206.
152. *Id.* at 213.
153. *Id.* at 218.
154. *Id.* at 211.
155. *Id.* at 215–16.
156. *Id.* at 212 n.7.
157. Kline v. Sec. Guards, Inc., 386 F.3d 246, 256 (3d Cir. 2004) (citing Berda v. CBS Inc., 881 F.2d 20, 27 (3d Cir. 1989)).

preempted.[158] The circuits have reinforced this rule by holding that a collective bargaining agreement could not authorize a violation of state or federal law even if it purported to do so.[159] Therefore, no term would be subject to interpretation. The illegality exception has been extended to include claims that assert a public policy violation of a state.[160] Employees—under the reasonable person standard from tort theory—have a right to assume their employers will obey the law since illegal behavior is inherently unreasonable.[161] Finally, the Supreme Court in *Lingle* held that preemption would not be supported simply because the same facts in the state claim could possibly support a grievance pursuant to the collective agreement.[162] The circuits have therefore held that the existence of a grievance process in an agreement is irrelevant for preemption purposes.[163]

The treatment of the tort of intentional infliction of emotional distress in the circuit courts of appeals provides a clear illustration of the preemption rules in application. If an employee alleges that an employer has committed such a tort, state law requires that the employee prove the employer's conduct to be "outrageous."[164] However, the term "outrageous" is not defined by tort law, so it must be decided on a case-by-case basis. In *Douglas v. American Information Technologies Corp.*, the Seventh Circuit preempted an intentional infliction of emotional distress charge because the complaint only alleged employer activity that was covered by the applicable collective bargaining agreement.[165] The court noted that the tort did not exist when the employer "has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress."[166] Similarly, in *Baker v. Farmers Electric Cooperative, Inc.*, the Fifth Circuit preempted a claim of intentional infliction of emotional distress because the plaintiff did not allege any activities by the employer that were outside of those sanctioned by the

158.    *Lueck*, 471 U.S. at 212. The most frequent types of these claims are based on assault and battery, retaliatory discharge, and age and gender (especially sexual favors) discrimination. *See* Goshorn, *supra* note 4, at 270.
159.    Alongi v. Ford Motor Co., 386 F.3d 716, 727 (6th Cir. 2004).
160.    *See* Goshorn, *supra* note 4, at 272–73.
161.    Cramer v. Consol. Freightways, Inc., 255 F.3d 683, 695–96 (9th Cir. 2001).
162.    *See supra* note 103 and accompanying text.
163.    *See* Humphrey v. Sequentia, Inc., 58 F.3d 1238, 1243–44 (8th Cir. 1995).
164.    Baker v. Farmers Elec. Coop., 34 F.3d 274, 280 (5th Cir. 1994); Douglas v. Am. Info. Techs. Corp., 877 F.2d 565, 570–71 (7th Cir. 1989).
165.    *Douglas*, 877 F.2d at 572–73.
166.    *Id.* at 571 (quoting Pub. Fin. Corp. v. Davis, 360 N.E.2d 765, 768 (Ill. 1976)).

collective bargaining agreement: "Baker does not allege that any action on the part of the defendants other than his reassignment to a maintenance position has caused him mental distress. He alleges no instances of harassment, discrimination, physical abuse, or other conduct which would provide grounds for an emotional distress claim."[167]

If the collective bargaining agreement could not possibly sanction the employer's activity (e.g., assault and battery or sexual harassment), the definition of "outrageous" can be determined without reliance on the agreement, and preemption is not warranted.[168] However, conduct authorized by the bargaining agreement—such as the reassignment of an employee here—requires interpretation of the agreement in order to define an element of the claim. Such conduct cannot be "outrageous" and preemption is mandated.[169]

In *Lightning v. Roadway Express, Inc.*,[170] the Eleventh Circuit adopted the analysis of the Fifth and Seventh Circuits, but reached a different result based on the facts before it. Lightning alleged that Roadway management had spit on him, verbally abused him and tried to hit him.[171] The court affirmed the District Court's holding that Lightning's claim was not preempted:

> Contrary to Roadway's assertions, Lightning's intentional infliction of emotional distress claim does not concern the terms and conditions of his employment, but rather the severe abuse he endured from Roadway's supervisors. . . . Thus, Lightning's claim "revolve[s] around conduct by his employer that is not even arguably sanctioned by the labor contract."[172]

The resolution of the preemption issue thus centered on whether the plaintiff's complaint alleged outrageous conduct by the defendant that was outside the scope of the collective bargaining agreement.[173]

---

167. *Baker*, 34 F.3d at 280.
168. *Id.* at 280–81.
169. *Id.*
170. 60 F.3d 1551, 1557-58 (11th Cir. 1995).
171. *Id.* at 1554–55.
172. *Id.* at 1557 (alteration in original) (quoting Keehr v. Consol. Freightways of Del., Inc., 825 F.2d 133, 138 n.6 (7th Cir. 1987)).
173. Other circuit courts of appeals have accepted this distinction between complaints which only alleged activity covered by a collective bargaining agreement and those which allege actions outside of anything contemplated by the agreement. *See*

The circuits also agree that non-signatories to the collective bargaining agreements may not bring § 301 lawsuits and, therefore, are not able to assert § 301 preemption.[174] The lower courts also have held that § 301 preemption should be granted only when doing so furthers the purposes behind the Labor-Management Relations Act as stated in *Livadas*—preventing state law from deciding what parties agreed to in a collective bargaining agreement, determining what legal consequences flow from breaches of the agreement, and permitting parties to renege on their arbitration promises by relabeling grievable issues as tort claims.[175] Lawsuits involving non-signatories do not implicate any of the recognized purposes of the LMRA and § 301 preemption is therefore appropriately irrelevant to such a dispute.

## IV. PREEMPTION CONFUSION

The concepts noted in Part III are easy to comprehend as black letter law. However, certain repeated misunderstandings in the application of those principles have produced the judicial confusion noted in many Courts of Appeals' opinions. Most of the difficulties are caused by a court expanding the reach of § 301 preemption beyond its intended scope. This judicial overreaching manifests itself in four basic ways:

> (1) a lack of clarity regarding what is an element of a claim and what is a defense; (2) a decision to preempt because a collective bargaining agreement has terms dealing with the general subject matter of the complaint, but not the specific claim alleged; (3) a different interpretation of the concept of "duty"; and (4) an erroneous perception regarding the role of a collective bargaining agreement's grievance process in the preemptive assessment.

As noted above, the case law is clear that preemption analysis should be focused solely on the plaintiff's complaint and not potential defenses by the defendant.[176] However, even this seemingly "bright

---

Perugini v. Safeway Stores, Inc., 935 F.2d 1083, 1089 (9th Cir. 1991); Fox v. Parker Hannifin Corp., 914 F.2d 795, 802 (6th Cir. 1990).

174.    *See* Jackson v. Kimel, 992 F.2d 1318, 1325 n.4 (4th Cir. 1993); UMWA v. Covenant Coal Corp., 977 F.2d 895, 898 (4th Cir. 1992); *see also* Goshorn, *supra* note 4, at 271–72.

175.    Foy v. Pratt & Whitney Grp., 127 F.3d 229, 234 (2d Cir. 1997) (citing Livadas v. Bradshaw, 512 U.S. 107, 122–23 (1994)).

176.    *See supra* Parts II–III.

UNIVERSITY OF BALTIMORE LAW REVIEW       Vol. 46

line" test can be difficult to apply as judges disagree on what is
defined as an element of the claim and what is properly characterized
as a defense. This distinction split an en banc panel on the Fourth
Circuit regarding application of § 301 preemption to a claim of
intentional infliction of emotional distress in *McCormick v. AT&T
Technologies, Inc.*[177]   McCormick alleged that, after he was
terminated, an AT&T supervisor forced open his locker, removed his
personal possessions, and threw them in the trash.[178]  McCormick's
complaint alleged that, pursuant to Virginia tort law, such a
disposition constituted an intentional infliction of emotional distress,
negligent infliction of the same, conversion, and negligence in the
care of a bailment.[179]  Both the majority and the dissent agreed that
the critical inquiry involved the location of the defendant's duty.[180]
The majority concluded that, under Virginia law, the plaintiff had the
burden of proving that the defendant engaged in wrongful conduct
that was also "outrageous and intolerable."[181]  Both elements required
interpretation of the collective bargaining agreement for a resolution:

> If management owed him no duty and was entitled under the
> agreement to dispose of the contents of his locker in the
> manner it did, its actions *ipso facto* could not have been
> wrongful under state law. . . . If management's actions in
> disposing of the contents of McCormick's locker were
> authorized under the collective bargaining agreement, those
> actions could not simultaneously be considered "outrageous
> and intolerable" under Virginia law.[182]

The majority perceived that the plaintiff must establish the
defendant's duty, and his claims were preempted since interpretation
of the collective bargaining agreement was essential to determining
that issue.[183]
    The dissent argued vigorously that applicable Supreme Court
precedent indicated that preemption was appropriate when the
defendant's duty could be located *only* in the collective bargaining
agreement.[184]  The dissent believed the majority reached the wrong

177.  *See* McCormick v. AT&T Techs., Inc., 934 F.2d 531, 531 (4th Cir. 1991) (4-3 decision).
178.  *Id.* at 533.
179.  *Id.*
180.  *Id.* at 542, 543 (Phillips, J., dissenting).
181.  *Id.* at 535 (majority opinion).
182.  *Id.* at 537.
183.  *See id.* at 535–37.
184.  *Id.* at 543 (Phillips, J., dissenting).

conclusion by failing to look solely at the plaintiff's complaint, but instead considered the entire action—claims and defenses—in evaluating the propriety of preemption.[185]  Such methodology was in direct conflict with repeated Supreme Court holdings that the complaint alone should be considered in the assessment.[186]  The dissent then concluded with addressing what the relevant issue should be:

> [W]hether McCormick's well-pleaded state-law tort claim locates the duty allegedly violated by AT & T in their labor contact [sic] or in some source of legal duty independent of that contract.  The answer to that issue is plain: in an independent source, Virginia tort law.  Specifically, in the duty imposed by that body of law upon all persons, running to society in general and not dependent upon any employment relationships, (1) not to engage in intentional or reckless conduct (2) that is outrageous and intolerable, offending generally accepted standards of decency . . . .[187]

The issue of whether AT&T was authorized to open the locker and dispose of its contents was a defense that should be resolved properly at trial, not in a preemption motion.[188]  Since the tort duty pled in the complaint could be determined without reference to any collective bargaining agreement, the dissent concluded that McCormick's claims should not be preempted.[189]

*McCormick* confused the preemption analysis by incorrectly focusing on whether the defendant's conduct was authorized by the collective bargaining agreement.[190]  This emphasis is inconsistent with the accepted rule that a defense cannot support a preemption decision.  The majority should have adopted the analysis of other circuits that have considered the issue: did the complaint allege behavior outside of the scope of activities covered by the collective bargaining agreement?[191]  If yes, then the defendant's duty is independently grounded in state law and preemption is inappropriate; if no, then the complaint is substantially dependent on the contract

185.   *See id.* at 544.
186.   *Id.*
187.   *Id.* at 545.
188.   *See id.*
189.   *Id.* at 547.
190.   *See id.* at 544.
191.   *See* cases cited *supra* notes 163–73 and accompanying text.

and preemption should be applied. Since the collective bargaining agreement never mentioned lockers or the employer's ability to open them, preemption in *McCormick* was inappropriate because the complaint alleged behavior outside the scope of the collective bargaining agreement.[192]

The *McCormick* majority compounded its error by relying on general provisions of the collective bargaining agreement to justify opening the locker and disposing of its contents. The actual collective bargaining agreement contained no authorization for opening an employee's locker and no provision for dealing with the disposition of its contents.[193] Instead, the majority relied on a general management rights provision and the existence of a grievance process for any mandatory subject of bargaining.[194] Precedent clearly has established that a specific provision in an agreement is needed to support preemption; it cannot be granted simply because the claim relates to a mandatory subject of bargaining or the agreement deals with the general subject matter of the complaint.

This type of error is also illustrated by comparing two cases regarding concussions in professional football: *Duerson v. NFL*[195] and *Green v. Arizona Cardinals Football Club LLC.*[196] In *Duerson*, the estate of a deceased football player sued the NFL for negligence, fraudulent concealment, and negligent failure to warn regarding the organization's knowledge of the dangers of concussions in professional football and its failure to inform players of the brain damage possible from such concussions.[197] The district court preempted all of the plaintiff's claims by accepting the NFL's argument that the state-law tort standard of reasonableness required interpretation of the terms of the NFL's collective bargaining agreements.[198] The court then cited multiple provisions dealing with player health and concluded that those provisions might be interpreted to impose a general duty on the NFL clubs to provide health care for players.[199] The opinion then stated that the agreement's imposition of health care duties on the clubs could justify a lower standard of reasonableness for the NFL than generally

---

192. *See McCormick*, 934 F.2d at 536. For an application of a similar "something extra" beyond the collective agreement in any intentional tort claim, see Sagerian, *supra* note 3, at 267–69.
193. *McCormick*, 934 F.2d at 536.
194. *Id.*
195. No. 12 C 2513, 2012 WL 1658353, at *1 (N.D. Ill. May 11, 2012).
196. 21 F. Supp. 3d 1020 (E.D. Mo. 2014).
197. *Duerson*, 2012 WL 1658353, at *1.
198. *Id.* at *4.
199. *Id.*

required for state tort law.[200]    The decision failed to identify a specific term of the collective bargaining agreement, relying instead on the agreement's general inclusion of player health issues. As noted above, this methodology is inconsistent with preemption precedent.

In *Green*, a district court faced a preemption claim similar to *Duerson* in the context of a lawsuit against an NFL Club for negligence, negligent misrepresentation, and fraudulent concealment in failing to inform players about potential brain injuries from concussions.[201]    The defendant argued the same collective bargaining agreement provisions regarding general player safety that were accepted by *Duerson*.[202]    The *Green* opinion, however, correctly rejected the same preemption motion granted by the *Duerson* opinion.[203]    The opinion noted, "[H]ere the duties arise out of the common law based upon the employer-employee relationship and not out of any particular terms in the CBAs."[204]    The plaintiffs' right to rely is similarly situated in their common law status as employees, not a term in the collective bargaining agreement.[205]    The opinion further stated that the complaint is not alleging that the Club failed to provide anything required by the agreement; the complaint does not allege that the Club failed to provide a certified trainer or give pre-season physicals.[206]    The complaint simply alleges that the Club failed to provide a safe workplace or provide warnings of dangers the players could not reasonably have been expected to be aware of, as required by Missouri common law of torts.[207]    *Green* is therefore consistent with preemption precedent.

Another area of confusion is the ambiguous use of the term "duty" by courts.    The concept of a defendant's duty can arise in the first prong of the preemption test as reciprocal of the plaintiff's right.[208]    As noted above, that duty can be resolved by analyzing whether the duty is found *only* in the collective bargaining agreement.[209]

---

200.    *Id.*
201.    *See Green*, 21 F. Supp. 3d at 1024.
202.    *See id.* at 1028–30; *Duerson*, 2012 WL 1658353, at *4–5.
203.    *Green*, 21 F. Supp. 3d at 1030.
204.    *Id.* at 1028.
205.    *Id.* at 1030.    The court also noted that the assertions of the general terms of the agreement were, at best, defenses by the Club that could not justify preemption. *Id.*
206.    *See id.* at 1028.
207.    *Id.* at 1026–28.
208.    *See, e.g.*, Int'l Bhd. of Elec. Workers v. Hechler, 481 U.S. 851, 859 (1987) (exemplifying the issue of duty arising in first prong of preemption test).
209.    *See supra* notes 134–50 and accompanying text.

However, duty also can be raised as an issue in the second prong of the preemption test when it is included as an element in a plaintiff's common law tort claim.[210]  A court may look to the collective bargaining agreement as interpreting the common law element, as did the courts in *McCormick* and *Duerson*.[211]  In this vein, the duty issue is best resolved by only looking at the plaintiff's complaint and analyzing whether it alleges rights or duties outside of a specific term in the collective agreement.[212]  If it does, the duty is not substantially dependent on the interpretation of a collective bargaining agreement; if it does not, the duty is dependent and the interpretation of an essential element of the claim justifies preemption.  The dissent in *McCormick* confused this distinction by stating that preemption is applicable when the duty is found *only* in a collective bargaining agreement.[213]  The dissent had previously stated that the case was concerned with the second prong of the test—whether the complaint was substantially dependent upon a term of the collective bargaining agreement.[214]  This portion of the analysis should have been utilized only in the first prong of the test, not the second, interpretive prong.[215]  *Duerson* is more confused by stating that it was only employing the interpretive part of the test, but also stating at one point, "[s]howing that a duty raised in a state-law tort claim originates in a CBA is certainly sufficient to require preemption" and citing *Rawson*.[216]  *Duerson* did not properly delineate the differences between the two independent parts of the accepted preemption test, but simply blended the two together.

The concept of duty has been confused even further because of a quote by Justice White in *Rawson*: "This is not a situation where the Union's delegates are accused of acting in a way that might violate the duty of reasonable care owed to every person in society."[217]  Some courts have interpreted this language to mean that, for preemption purposes, the defendant's duty must be more than the

---

210.   *See, e.g.*, McCormick v. AT&T Techs., Inc., 934 F.2d 531, 535–36 (4th Cir. 1991) (exemplifying the issue of duty arising in the second prong of the preemption test).

211.   *Id.* at 536; Duerson v. NFL, No. 12 C 2513, 2012 WL 1658353, at *3 (N.D. Ill. May 11, 2012).

212.   Alongi v. Ford Motor Co., 386 F.3d 716, 724 (6th Cir. 2004).

213.   *McCormick*, 934 F.2d at 547–48 (Phillips, J., dissenting).

214.   *Id.* at 540.

215.   *See supra* notes 139–50 and accompanying text.

216.   *Duerson*, 2012 WL 1658353, at *4 (citing United Steelworkers v. Rawson, 495 U.S. 362, 369 (1990)).

217.   *Rawson*, 495 U.S. at 371.

common law tort duty and must be owed to everyone.[218]    Such a reading is too broad.  The better interpretation is that Justice White intended to reference traditional common law tort duty: a general duty owed to the public at large.[219]   Even if the narrower reading is incorrect, the most important preemption inquiry is the source of the defendant's duty, not individuals to whom it is owed.[220]

The final major source of confusion is the ambivalent use of a collective bargaining agreement's grievance process by the Supreme Court.  *Livadas* specifically stated that one of the purposes of the LMRA, which supports preemption, is not to allow employers or employees "to renege on their arbitration promises by 'relabeling'" grievable issues as tort claims.[221]    On the other hand, *Lingle* specifically stated that preemption is not appropriate even if the state-law claim encompasses the same set of facts as a grievance process as long as the compliant can be resolved without interpretation of the agreement.[222]    Therefore, the Supreme Court has stated that the existence of a possible grievance process is not relevant to determining whether a claim is independent of the agreement, but courts must be diligent to prohibit attempts to avoid the grievance process.

The *Lueck* decision both created the confusion and provided the basis for its ultimate resolution.  The use of the disjunctive "or" at the conclusion of the opinion implies that the preemption issue is a separate analysis from the meaning of the substantive federal common law which should ultimately resolve the case.[223]    Therefore, the existence of a grievance provision ending in arbitration was not relevant to the preemption result, but would be important in applying § 301 substantive law.  The preemption issue should be resolved by determining whether the state claim relied on a non-negotiable state-law right or is "inextricably intertwined" with the terms of a collective bargaining agreement.[224]    If the claim was substantially dependent on a term or provisions of the collective bargaining agreement, then substantive § 301 common law dictated that the plaintiff should not succeed because he failed to follow the grievance

---

218.    Brown v. NFL, 219 F. Supp. 2d 372, 380 (S.D.N.Y. 2002); Sherwin v. Indianapolis
        Colts, 752 F. Supp. 1172, 1177 (N.D.N.Y. 1990).
219.    Sagerian, *supra* note 3, at 239; Telis, *supra* note 130, at 1850.
220.    Stringer v. NFL, 474 F. Supp. 2d 894, 908 (S.D. Ohio 2007).
221.    Livadas v. Bradshaw, 512 U.S. 107, 123 (1994) (quoting Allis-Chalmers Corp. v.
        Lueck, 471 U.S. 202, 211 (1985)).
222.    *See supra* note 103 and accompanying text.
223.    *Lueck*, 471 U.S. at 220.
224.    *Id.* at 213.

procedure in the collective bargaining agreement. The Court confused the issue by stating early in the opinion that Lueck's state-law claim was preempted because of the national policy of encouraging arbitration.[225]  *Lucas Flour*, cited by *Lueck*, correctly placed arbitration in the substantive law of § 301.

Therefore, the proper resolution of this ambiguity should be that the existence of a grievance process is irrelevant to the decision of whether a claim is independent of the collective bargaining agreement. That analysis should proceed as detailed in this Article. If the claim is independent of the collective bargaining agreement, then preemption is inappropriate and the existence of a possible (or actual in *Lingle*) grievance should be ignored. However, if the claim is found to be substantially dependent on a term in the collective bargaining agreement, then the grievance process is the appropriate forum for raising the claim.[226]

## V. CONCLUSION

Much of the confusion in applying § 301 is related to a judicial desire to expand the scope of its preemptive reach. The analysis contained in this Article is premised on a narrower exclusion of state common law tort claims. The language in the relevant Supreme Court cases supports this perspective. In *Lueck*, the Court used the phrase "inextricably intertwined" to describe the relationship between a claim and a term of a collective bargaining agreement that justifies preemption.[227]  In *Williams*, the Court used the phrase "substantially dependent" to illustrate the fit between the complaint and collective bargaining agreement needed to support preemption.[228]  The adverbs contained in those formulations indicate that the relationship between the claim and a term in the contract must be close in order to support preemption. In *Livadas*, the Court described § 301 preemption as a "sensible acorn" and not a "mighty oak."[229]  The analogy is the Supreme Court's statement that a broad preemption of state common law claims is inappropriate. The Ninth Circuit has explicitly stated

---

225.  *Id.* at 219.
226.  *See* Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 411 (1988); Givens v. Tennessee Football, Inc., 684 F. Supp. 2d 985, 991–92 (M.D. Tenn. 2010) (quoting *Lueck*, 471 U.S. at 219–20). For a discussion on the insufficiency of arbitration as a remedy for state tort claims, see Sagerian, *supra* note 3, at 262–66.
227.  *Lueck*, 471 U.S. at 213.
228.  Caterpillar Inc. v. Williams, 482 U.S. 386, 395 (1987).
229.  Livadas v. Bradshaw, 512 U. S. 107, 122 (1994) (citations omitted).

that § 301 preemption should be narrowly interpreted.[230] The dissent in *McCormick* acknowledges that its analysis:

> [Section 301] dictates a comparably limited scope for the preemptive force of that statute. It obviously preempts state-law claims formally alleging violations of labor contracts – the exact and only kind expressly made federal ones by § 301. Beyond those, it only preempts, as a matter of judicial interpretation, state-law claims that can be determined to be claims for violation of labor contracts in substance though not in form, and those only out of the felt necessity that parties not be allowed "to evade the requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract."[231]

In fact, some scholars have argued that the limited scope of this inquiry means that intentional torts should never be preempted.[232]

The narrow interpretation embraced by this Article is consistent with Supreme Court opinions and significantly reduces the confusion regarding the application of § 301 preemption. This approach also restores the balance between the common law rights of unionized and non-unionized workers.[233] Neither Congress nor the Supreme Court intended to restrict state common law tort claims unless there were clear indications that the plaintiff was, in effect, filing a disguised contract claim. The proposals contained herein reinvigorate the true meaning of § 301 while still preserving the grievance process for those contract claims that are properly within its jurisdiction.

---

230. Balcorta v. Twentieth Century Fox-Film Corp., 208 F.3d 1102, 1108 (9th Cir. 2000) (citations omitted).
231. McCormick v. AT&T Techs., Inc., 934 F.2d 531, 543 (4th Cir. 1991) (Phillips, J., dissenting) (quoting *Lueck*, 471 U.S. at 211).
232. Sagerian, *supra* note 3, at 232. For a contrary view, see Telis, *supra* note 130, 1860–64.
233. *See supra* note 126 and accompanying text.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JUAN DE LOS SANTOS . | ) No. 23-CV-11305-DJC |
| PLAINTIFF, | ) |
| V. | |
| SERVICE EMPLOYEES and INTERNATIONAL | ) |
| UNION LOCAL 615 32BJ and TRUSTEES OF BOSTON ) | |
| UNIVERSITY, | |
| DEFENDANTS, | ) |

## AFFIDAVIT OF JUAN DE LOS SANTOS

**I, Juan Delossantos, hereby depose and state that the following statements and facts are
true and correct under the pains and penalties of perjury:**

1.   My name is Juan De Los Santos, and I am an adult of sound mind over the age of 18.

2.   I was employed as a fulltime employee for Boston University as a Janitor from years 2006,

through 2021, (fifteen years), without any similar prior incident alleged, until I was unlawfully

framed and accused of making statements and communicating statements that were found by the

· Defendant Boston University's Human Resources Office, to constitute sexual harassment despite

my repeated denials of any wrongdoing relative to the allegations by BU.

3.   The accuser Jamie Baker, a coworker, who concocted and conjured up false allegations of

sexual harassment, was often late for work, and not competent to perform simple work tasks, and

Baker would call me on weekends to inform me he was going to be late even though Baker accused

me of sexual harassment. These facts were corroborated by a third-party disinterested witness

named Osman Barrera.   See Sworn Affidavit of Osman Barrera, attached herein as Exhibit "3,"

4.   The three-page sworn Affidavit that was prepared and filed by my co-worker named Osman

Barrera, was to the best of my knowledge, redacted by and/or with the consent of the Union's

former Attorney named Ms. Ingrid Nava located in New York.   For instance, it appears from the

1

altered affidavit, that Ms. Nava authorized sections of the affidavit to be whited out, omitted key facts that favored me, and shortened the most crucial beneficial paragraphs that favored me before the Union to deliberately and adversely tamper with the record as set forth by my own Union.

5. The fact that this Court dismissed my Union SERVICE EMPLOYEES and INTERNATIONAL UNION LOCAL 615 32BJ, as a Defendant, appears adverse on its face, in reality it is not relevant to the numerous claims I have against defendant Boston University and others such as the Title XI Director, and others, because I never signed any written agreement agreeing to be subject to Arbitration, or the Defendant SERVICE EMPLOYEES and INTERNATIONAL UNION LOCAL 615 32BJ.

7.    My co-worker named Scott Anglin provided a statement to Investigator Sullivan on July 12, 2021, and he stated when asked about me stating on page two (2), that **"there was some awkwardness, Juan's accent is thick."**  See Exhibit "2" herein.

8.    When my co-worker Sullivan heard that my co-worker called me awkward for simply having a thick accent, he is not on the record, of admonishing Mr. Anglin, or any of my other co-workers who discriminated against me based on my Communication and Linguistic Disability, which is protected by the Federal Americans with Disabilities Act of 1990.

9. In other words, the Investigator, Sullivan, that was assigned and appointed to investigate me, was predisposed with a bias towards, me, because when another Caucasian White Male from northern European decent, Scott Anglin, described me as "awkward" specifically, by stating **"there was some awkwardness, Juan's accent is thick."**    See **Exhibit "2"** herein; the Investigator assigned by defendant Boston University to conduct what is supposed to be an impartial and neutral investigation, never condemned, or admonished my co-workers for discriminating against me, as a Dominican Spanish immigrant who immigrated from the

2

Dominican Republic and it is obvious I do not speak English well especially compared to my Spanish speaking ability.

10.    These deliberate racist and discriminatory actions caused me to suffer severe emotional distress, causing me to be under the care of a psychiatrist.   See Medical Records Attached as Exhibit "6."

11.   Investigator Sullivan also further discriminated against me himself on the basis of my Sexual Orientation as a married male, on July 12 2021, and documented for this Court defendant's Boston University's Title XI proceedings, and hearings are biased, rigged, manipulated, tampered with, and fabricated by the unfair and dishonest arrangement by defendant BU to force an arrangement to predetermine the outcome by Investigator Sullivan asking Scott Anglin whether accuser Jamie Baker asked if I was gay.   See Exhibit "2", page 3, paragraph 4.

12.    Again, these deliberate racist and discriminatory actions caused me to suffer severe emotional distress, causing me to be under the care of a psychiatrist.   See Medical Records from my psychiatrist Attached as Exhibit "6."

13.    On November 18, 2021 Boston University my employer for fifteen years, (15), after its rigged and biased Investigation whereby the Investigator himself Sullivan asked former co-worker Anglin if I was awkward, and whether I was Gay in violation of my civil rights by the Boston University employer who is a recipient of Tite IV Federal Aid, and awarded my son over $ 200,000 in free tuition, yet terminated my employment. See Exhibits "4" and "5."

14.   On Friday, Aug 19, 2022, at 10:38 AM Reply-To: hr@bu.edu To: johndls@bu.edu BU's HR Office, emailed my son John by stating "**Hello John, The Tuition Remission Benefit has been processed for Fall 2022 semester. Let me know if we can be of further assistance.**" Sincerely, **Karl Arita Boston University Human Resources.**"   See Exhibit "5" herein.

15.    I am willing and able to testify, that Boston University's Human Resources office, through written emails to my son, attached herein, as Exhibit "5"; reconsidered their decision to categorize my previous status  as a terminated employee, to be in good standing, and granted my son and dependent a 90% tuition waiver, which could not have been awarded to my son, if I remained in a terminated status of employment. See **Exhibit "5" herein.**

16.    Included as part of my son's award of financial Aid are Federal Pell grants, and other federally regulated scholarships and grants from the US Department of Education.   See Exhibit "5."

17.    I am willing and able to testify to the lost wages that I have been deprived of in the amount of roughly $ 60,000 per year over the last four years, totaling  $ 240,000 as well as psychological harm, I have suffered for being accused of sexual harassment when I cannot at times even be understood due to my thick accent and English as a secondary language. See **Exhibit "2."**

18.    I am also willing to testify that I was never given an Employee Handbook, or the right to request the work clothes of my accuser to establish the absence of my DNA, fingerprints, or to be permitted to cross examine my accusers through an Interpreter because I am Dominican Spanish native from the Dominican Republic who speaks limited English..

19. As a happily married family man, I worked as a janitor to clean and mop the floors of defendant Boston University among other tasks so my children could achieve a Bachelor's degree etc.

20.    As an immigrant who has been maliciously prosecuted and discriminated against on the basis of his Communication Disabilities and Linguistic Disabilities by Boston University's Title IX Office, and neglected by my Union, which wrongfully dismissed me when none of the facts of my sworn Affidavit were ever before the Union, or the Title IX Office.

21.   I have been an active member of the Basilica of Our Lady of Perpetual Help located at 1545 Tremont Street Boston, MA 02120 since 1985 when he immigrated to the United States from the Dominican Republic. See Exhibit "1"; letter from Reverand Sean McGillicuddy, C.S.S.R.

22.   I was never informed by BU as my employer or my Union, that I could have called Reverand Sean McGillicuddy, C.S.S.R. as a witness to the Title IX hearings or this Court prior to this Court's dismissal of the defendant Union from his case.

23.   I was never informed or advised, in Spanish or English or offered an interpreter to advise me, that I had the right to call my family members to the Title IX hearing, or to have my son testify that Boston University granted him as my dependent son 90% tuition remission after my son John advocated for my tenure and long term employment which the BU Human Resources Office that previously wrongfully terminated me, granted my son, a 90% tuition waiver which I believe supersedes and vacates their previous decision to terminate, me.

24.   I intended to request that my employer and Defendant, Boston University as a institute of higher education, to relocate my employment as a janitor to one of three principal campuses: the Charles River Campus in the Back Bay, the Fenway Campus in Boston, and/or the Medical Campus in the South End, which I was not aware how to request nor was I ever provided with an Employee Handbook which he could read and understand or understood through an interpreter.

25.   I am willing and able to testify as to the facts and statements, and attachments in this Sworn Affidavit to the best of my ability either in open court, or by Zoom video, before the Judge,etc.

26. I have no memory of ever signing anything in writing that would demonstrate I was a member of the Union at BU where I was employed for 15 years to agree to arbitrate my case on the papers the outcome of my arbitration and I have no memory of signing anything to become a member of the union.

5

Sworn to under the pains and penalties of perjury on this 20th day of December of 2024.

Juan De Los Santos

# EXHIBIT "1"

12/16/24, 5:30 PM



# BASILICA OF OUR LADY OF PERPETUAL HELP
### 1545 TREMONT STREET, BOSTON, MA 02120
PHONE: 617-445-2600 • WWW.BOSTONSBASILICA.COM

December 16, 2024

To Whom It May Concern:

Re: Mr. Juan Bautista De Los Santos

Mr. Juan Bautista De Los Santos of 44 Supple Road, Dorchester, MA 02121 has been a faithful participant in the Eucharist at the Basilica of Our Lady of Perpetual Help for fifteen years. Prior to coming to the Basilica he attended Our Lady of Lourdes and St. Thomas Churches in Jamaica Plain. He also still participates in the Eucharist at these churches at times.

Mr. De Los Santos and his family are respected members of the community. He, himself, enjoys a good reputation. He was asked to be a godfather for Baptism, a sign of deep respect in the community, on four occasions. He is a very good father and husband, and a very diligent worker. He also takes an interest in the well being of the wider community. He has volunteered in a food pantry, which has provided help to the needy of the community.

If you are in need of further information, I can be reached at the above telephone number.

Sincerely,

Rev. Sean McGillicuddy, C.Ss.R.

REDEMPTORIST FATHERS



# OUR LADY OF LOURDES PARISH
14 Montebello Road
Jamaica Plain, MA 02130 USA
*Mailing address: 97 South Street, Jamaica Plain, MA 02130*
Tel: 617-524-0240  Fax: 617-524-1840

December 18, 2024.

To Whom It May Concern,

My name is Rev. Carlos Flor, and I am the current pastor at the parish of Our Lady of Lourdes, in Jamaica Plain, MA, of the Roman Catholic Archdiocese of Boston.

The main purpose of this letter is to speak on behalf of **Mr. Juan De los Santos**, who resides at 44 Supple Road, in Dorchester, Massachusetts.

Mr. De los Santos attends to our liturgical celebrations and has been a member of our parish community since 1988. He is married and is the father of four children.

Moreover, Mr. De los Santos is a good, disciplined citizen. He has all the necessary moral, Christian values to live in society, and therefore, he deserves all our trust.

If you have any more question regarding his present status, please do not hesitate to contact me at the number shown above.

Sincerely,

Rev. Carlos Flor
Pastor.

Scanned with CamScanner

# EXHIBIT "2"

**BOSTON UNIVERSITY** **Boston University** Equal Opportunity Office
888 Commonwealth Ave., Suite 303
Boston, Massachusetts 02215
T 617-353-0911 F 617-358-0490
www.bu.edu/eoo

## CONVERSATION SUMMARY (CONFIDENTIAL)

The following conversation summary was taken from a meeting between Investigator Sullivan and Scott Anglin on July 12, 2021. At the outset of the conversation, Investigator Sullivan explained the EOO's role, including investigating claims made against non-students, the University's non-retaliation policy, confidentiality vs. privacy in an EOO investigation as well as their right to resources and support. Sullivan asked if Anglin had any questions or concerns regarding the policies and procedures as outlined and noted they can ask questions at any time if something comes to mind. She noted that the EOO is not recording this conversation and does not consent to being recorded.

EAS: What's your official position title?

SA: Custodian. Full-time.

EAS: How long have you worked at BU in that role?

SA: 4 years as a full timer.

EAS: What are your primary responsibilities?

SA: I also drive the Zamboni two days a week as part of my job. I work on the ice and clean locker rooms. Depends on the day. Today I cover men's lacrosse and a handful of bathrooms and I cover the ice not that there is anyone on the ice today, there are some practices. Weekends are a little different because I cover the main hallway. I cover two bathrooms, the girl's hockey locker room, and the visitors.

EAS: I think you just answered my next question, which was about which area you typically work in. Seems like you do a lot with the ice.

SA: The days I'm not covering the ice I cover some of the sports locker rooms.

EAS: My understanding is that you've worked with both Juan Delossantos and Jamie Baker. Is that correct?

SA: Correct.

EAS: Have you observed them together?

SA: Yeah, we've done projects together.

EAS:  How often would you say you've observed them together?

SA:  Mainly on weekends when we'd have a project. Two of the days I'm not here that Jamie was. He was Tuesday-Sunday and I only worked Saturdays and Sundays with him.

EAS:  How would you describe Juan and Jamie's interactions and/or relationship?

SA:  There interactions were fine. As much as people trying to do a project together was. There were arguments between them, same with me. Just trying to get the project done in a timely fashion.

EAS:  Would you say they were friendly, awkward?

SA:  There was some awkwardness. Juan's accent is thick.

EAS:  Can you expand upon that?

SA:  Sometimes it was hard to understand what he was saying. There were a lot of misunderstandings. Not fully understanding what he's saying or his direction.

EAS:  Have you ever observed either party to be inappropriate in the presence of the other?

SA:  Can't say that I have.

EAS:  Do you recall a conversation about home security between yourself, Jamie, and Juan?

SA:  Can't say I do.

EAS:  Do you recall Juan indicate that he has cameras set up in his home?

SA:  Not that I know of but I know he lives in a 2 family so he might have cameras for his rentals.

EAS:  Has Juan ever talked to you about Jamie?

SA:  No, not outside of work.

EAS:  Meaning it would always be work related?

SA:  Yes.

EAS:  Has Jamie ever talked to you about Juan?

2

SA:     Not really. Other than him not understanding him and stuff like that. My conversations with both of them were mostly work related other than Juan about his daughters and son on a few occasions.

EAS:    Has Jamie ever asked you about Juan's relationship status or family life?

SA:     Can't say he has.

EAS:    Did Jamie ever ask you whether Juan was gay?

SA:     Not that I know of.

EAS:    Have you ever observed anything unusual about the interactions between Juan and Jamie?

SA:     No, they tend to argue a lot.

EAS:    What would they argue about?

SA:     About the project or who was doing what with the project, the tasks at hand.

EAS:    Did you ever observe Jamie appear to be avoiding interactions with Juan?

SA:     For a while there I don't know if he was avoiding actions or if he was late. Not sure he was deliberately avoiding Juan or the fact he was showing up late.

EAS:    Was it common for Jamie to be late?

SA:     For a while there. He was taking the train so I kind of gave him some leeway. I didn't complain about it.

EAS:    Did you notice his attendance improve once Juan was out?

SA:     Yeah, I guess. He showed up more to the break room. On time I guess.

EAS:    Have you ever observed Juan to seek out Jamie?

SA:     Not unless we had a project to do.

EAS:    Has Juan ever asked you about Jamie's location?

SA:     Not that I can remember. Jamie was always kind of easy to find, he was in one of two places. He covered men's lacrosse on the days I'm not here.

EAS:    Did you ever come across Jamie and Juan's in the men's lacrosse locker room together?

3

SA:   Yes.

EAS:   Do you call where they were situated?

SA:   They have a lounge area.

EAS:   How often would you say you came across them in the lounge area?

SA:   Enough. A handful of times. I can't really say I recall the number.

EAS:   What about in the custodial closet across from the men's lacrosse locker room?

SA:   No.

EAS:   Anything else you think I should know?

SA:   No. Nothing that comes to mind.

EAS:   You mentioned Jamie said something about what was happening. What did he tell you?

SA:   Jamie had told me that this was going on. Since Juan left in March I haven't had contact with Juan. Jamie was here for that bit of time. I want to say the first weekend, March 20th I had a conversation with Juan to see if he was coming in. Since then I was like is Juan coming in this weekend and Jamie said he heard him talking to Wayne, my manager, that he was taking the weekend off. I reached out to Juan and said enjoy your weekend, see you Wednesday. I work Wednesdays with Juan. I work Monday, Tuesday, Wednesday, and the weekends.

EAS:   What did Jamie say was going on?

SA:   He elaborated that he had issues with Juan.

EAS:   Had he ever previously mentioned having issues with Juan?

SA:   No.

**End of Notes.**

4

# EXHIBIT "3"

## Affidavit of Osman Barrera

**I, Osman Barrera, under the pains and penalties of perjury state the following:**

1.  My name is Osman Barrera and I am currently employed as a lead custodian worker at Boston University since 2002, so at least 20 years. I was previously a custodian worker when Juan Delossantos was a custodian and we also both operated the Zamboni. In fact, I taught him how to operate the Zamboni at BU.

2.  I have known Juan through working together and personally for many years. Although we did not always work the same shift, we did work together for a significant period of time, especially when we were working overtime together.

3.  While I was working with Juan, our duties consisted of typical maintenance type assignments that custodians customarily performs such as cleaning trash removal, snow removal, and the Zamboni operation at the BU rink.

4.  During games or special events, I would work overtime and during these times workers from different shifts would work together such as myself and Juan. I also worked the day shift with Juan, I believe in 2020 for several months.

5.  During the long period of time that I have known Juan including the time I worked with him and observed his actions, and work ethic, he was a great worker, a team player, and never treated me in an improper manner either by his words or physical actions. I also never observed him act inappropriately with any other coworkers including but not limited to Jamie Baker.

6.  I was absolutely shocked to learn that Juan was terminated by BU in 2021 as were many of my coworkers. I was never given any information as to the basis for his termination by BU other than I was led to believe his termination involved Jamie Baker.

1

7. I also know Jamie Baker who was formerly a part time worker. I had observed them work together on occasion and never saw any indication whatsoever of any improper behavior by Juan toward Mr. Baker. I also worked on occasion with Mr. Baker.

8.     The work ethic of Juan and Mr. Baker were not the same as Juan's work ethic was far superior in my opinion. Mr. Baker was known to frequently be late for work especially on the weekends and when I worked with him often had to show him how to complete fairly simple tasks such as using a snow blower properly. I was also aware that he would call Juan on weekends at work when he was most often late, likely because Mr. Chaney, the manager, did not work, which Baker knew. He would call Juan instead of the base, or main office which he was supposed to do and which he should have known was BU's protocol.

9.     I had mentioned to Juan that Baker being late consistently and calling Juan, or Scott was not proper protocol and I believe Juan thereafter mentioned to Baker not to call him if he was late but to call the main office in the future which I do not believe Baker was happy about.

10. Thereafter, I learned that Juan was suspended or terminated shortly thereafter and shockingly Baker was promoted almost at the exact same time which was very odd because my understanding of BU company policy was if a part time worker had been disciplined in any way, he or she would not be eligible for a promotion for a minimum of six months. That protocol was not followed here in my opinion. If you ask me or my coworkers, it would be considered unheard of if a part time worker was facing any discipline to then be immediately promoted instead, so when this happened not only I but many of my coworkers were truly shocked to hear this.

11. I also find it odd that Mr. Baker would call Juan on the phone at work on weekends to advise he was running late if he had an issue with Juan.

12.    I was never contacted by anyone as to my knowledge and interaction with both individuals which I also believe was odd because I could have provided information as to both individuals truthfully based on my interactions with both and tenure at BU.

13. Mr. Wayne Chaney, Juan's manager, was very fond of Juan and often referred to him as Big Papi after the former Red Sox star player.

14.    I was also informed that Mr. Baker was most recently suspended for being caught sleeping on the job, also continues to be late and had an incident relative to his truthfulness of having covid and being out of work. I was told the foregoing by a co worker so do not have personal knowledge of this information but am only relaying what was told to me.

15. In my opinion Juan did not deserve to be terminated; he was an excellent worker, and I never observed any wrongdoing or inappropriate behavior by him toward any coworker. I believe if my coworkers who had long term interaction with Juan and Mr. Baker were interviewed and involved in whatever process took place, Juan would not have been terminated and he would still be working here as well.

16.    I and many of my coworkers miss Juan and frequently inquired as to what happened but BU refused to provide much information. This process seems suspect to me as it is uncommon in my experience at BU for one worker to be let go and another simultaneously promoted.

17. I love and value my job at BU and I know Juan does too. In my opinion, he deserves to be working here at present.

SIGNED UNDER THE PAINS AND PERJURIES THIS 18th Day of November, 2022.

Osman Barrera

# EXHIBIT "4"

Boston University Campus Planning & Operations



Michael J. Donovan, Esq.
Vice President
One Silber Way, Suite 914
Boston, Massachusetts 02215
T 617-353-4468 | F 617-353-4467

November 18, 2021

Juan De Los Santos
44 Supple Road
Boston, MA 02121
juandelossantos624@gmail.com

Via priority mail and via email

Dear Juan:

As you have been informed, your employment as Custodian with Boston University is being terminated as a sanction for violating the University's Sexual Misconduct Policy and Sexual Misconduct/Title IX Policy. Your termination is effective Friday, November 19, 2021.

Your final pay will be deposited on November 19, 2021, representing your pay through November 19, 2021 plus any unused earned vacation time. Information concerning your benefits will be sent in a separate mailing.

Please mail, in the enclosed pre-paid mailing label, all uniforms and keys, your ID card and any other property belonging to Boston University to Lisa LaFrance Assistant Director, Support Services.

Sincerely,

Michael Donovan
Vice President for Campus Planning & Operations

Cc:    Employee File - - (U52494132)
       Gregg Hanscom, Human Resources Business Partner

Boston University Campus Planning & Operations



Michael J. Donovan, Esq.
Vice President
One Silber Way, Suite 914
Boston, Massachusetts 02215
T 617-353-4468 | F 617-353-4467

18 de noviembre de 2021

Juan De Los Santos
44 Supple Road
Boston, MA 02121
juandelossantos624@gmail.com

A través de correo prioritario y de correo electrónico

Estimado Juan:

Como ya se le ha informado, su empleo como Custodio en la Universidad de Boston se dará por terminado como sanción por haber violado la Política de Conductas Sexuales Inapropiadas de la Universidad y la Política de Conductas Sexuales Inapropiadas del Título IX. La terminación será efectiva el viernes 19 de noviembre de 2021.

Su pago final se depositará el 19 de noviembre de 2021 y en concepto de pago hasta el 19 de noviembre de 2021, incluyendo cualquier período de vacaciones acumuladas no gozadas. La información relativa a sus beneficios se enviará en un correo aparte.

Por favor, envíe por correo todos los uniformes y llaves, su tarjeta de identificación y cualquier otro bien que pertenezca a la Universidad de Boston utilizando la etiqueta postal prepaga adjunta dirigida a Lisa LaFrance, Directora Asistente, Servicios de Apoyo.

Atentamente,

Michael Donovan
Vicepresidente de Planificación y Operaciones del Campus

Cc:    Archivo de Empleado - - (U52494132)
       Gregg Hanscom, Socio Comercial de Recursos Humanos

# EXHIBIT "5"



John De Los Santos <johndls@bu.edu>

# About Case 228630: Re: Tuition remission form U08398507
6 messages

---

**Human Resources** <hr@bu.edu>
Reply-To: hr@bu.edu
To: johndls@bu.edu

Thu, Aug 18, 2022 at 9:09 AM

Hello John,

Thank you for sending your son's Tuition Remission Application.

Your father's appointment ended with the University on 11-20-2021 by means of involuntary retirement. Because of this, him and his dependents are no longer eligible for the Tuition Remission Benefit.

Let me know if you have any questions.

Sincerely,

Kari Arita
**Boston University** Human Resources
http://www.bu.edu/hr/

Send BU Human Resources a secure email

-----Original Message-----
From: johndls@bu.edu
Sent: Wednesday, August 17, 2022 1:17 PM
To: hr@bu.edu
Subject: Tuition remission form U08398507
Hello,
Attached is the tuition remission form for fall 2022.
Thanks,John De los Santos

---

**John De Los Santos** <johndls@bu.edu>
To: hr@bu.edu

Thu, Aug 18, 2022 at 10:18 AM

Hello,

Previously, I was informed that regardless of his termination he has retiree status. That is because he was over 55 years old and worked at BU more than 10 years the tuition remission benefit still applies. I was informed that I would only need to submit the physical copy instead of the web format and have been doing so.

Thanks,
John De los Santos

On Thu, Aug 18, 2022 at 9:14 AM Human Resources <hr@bu.edu> wrote:

Hello John,

Thank you for sending your son's Tuition Remission Application.

Your father's appointment ended with the University on 11-20-2021 by means of involuntary retirement. Because of this, him and his dependents are no longer eligible for the Tuition Remission Benefit.

Let me know if you have any questions.

12/9/24, 4:32 PM                    Boston University Mail – About Case 228630: Re: Tuition remission form U08398507

Sincerely,

Kari Arita
**Boston University** Human Resources
http://www.bu.edu/hr/

Send BU Human Resources a secure email

-----Original Message-----
From: johndls@bu.edu
Sent: Wednesday, August 17, 2022 1:17 PM
To: hr@bu.edu
Subject: Tuition remission form U08398507
Hello,
Attached is the tuition remission form for fall 2022.
Thanks, John De los Santos

---

**Human Resources** <hr@bu.edu>
Reply-To: hr@bu.edu                                         Fri, Aug 19, 2022 at 8:43 AM
To: johndls@bu.edu

Hi John,

Your Tuition Remission Application is currently under review. i will email you once the review is complete.

Sincerely,

Kari Arita
**Boston University** Human Resources
http://www.bu.edu/hr/

Send BU Human Resources a secure email

-----Original Message-----
From: johndls@bu.edu
Sent: Thursday, August 18, 2022 10:18 AM
To: hr@bu.edu
Subject: Re: About Case 228630: Re: Tuition remission form U08398507
Hello,
Previously, i was informed that regardless of his termination he has retiree status. That is because he was over 55 years
old and worked at BU more than 10 years the tuition remission benefit still applies. I was informed that I would only need
to submit the physical copy instead of the web format and have been doing so.
Thanks, John De los Santos

On Thu, Aug 18, 2022 at 9:14 AM Human Resources <hr@bu.edu> wrote:

Hello John,

Thank you for sending your son's Tuition Remission Application.

Your father's appointment ended with the University on 11-20-2021 by means of involuntary retirement. Because of this,
him and his dependents are no longer eligible for the Tuition Remission Benefit.

Let me know if you have any questions.

Sincerely,

Kari Arita
**Boston University** Human Resources
http://www.bu.edu/hr/

Send BU Human Resources a secure email

From: johndls@bu.edu [johndls@bu.edu]
Sent: Wednesday, August 17, 2022 1:17 PM
To: hr@bu.edu [hr@bu.edu]
Subject: Tuition remission form U08398507
Hello,
Attached is the tuition remission form for fall 2022.
Thanks, John De los Santos

---

Human Resources <hr@bu.edu>                                      Fri, Aug 19, 2022 at 10:38 AM
Reply-To: hr@bu.edu
To: johndls@bu.edu

Hello John,

The Tuition Remission Benefit has been processed for Fall 2022 semester.  Let me know if we can be of further assistance.

Sincerely,

Kari Arita
**Boston University** Human Resources
http://www.bu.edu/hr/

Send BU Human Resources a secure email

-----Original Message-----
From: "Human Resources"
Sent: Friday, August 19, 2022 8:43 AM
To: johndls@bu.edu
Subject: Re: About Case 228630: Re: Tuition remission form U08398507

Hi John,

Your Tuition Remission Application is currently under review.  I will email you once the review is complete.

Sincerely,

Kari Arita
**Boston University** Human Resources
http://www.bu.edu/hr/

Send BU Human Resources a secure email

From: johndls@bu.edu [johndls@bu.edu]
Sent: Thursday, August 18, 2022 10:18 AM
To: hr@bu.edu [hr@bu.edu]
Subject: Re: About Case 228630: Re: Tuition remission form U08398507
Hello,
Previously, I was informed that regardless of his termination he has retiree status. That is because he was over 55 years old and worked at BU more than 10 years the tuition remission benefit still applies. I was informed that I would only need to submit the physical copy instead of the web format and have been doing so.
Thanks, John De los Santos

On Thu, Aug 18, 2022 at 9:14 AM Human Resources <hr@bu.edu> wrote:

Hello John,

Thank you for sending your son's Tuition Remission Application.

Your father's appointment ended with the University on 11-20-2021 by means of involuntary retirement. Because of this, him and his dependents are no longer eligible for the Tuition Remission Benefit.

Let me know if you have any questions.

Sincerely,

Kari Arita
**Boston University** Human Resources
http://www.bu.edu/hr/

Send BU Human Resources a secure email

From: johndls@bu.edu [johndls@bu.edu]
Sent: Wednesday, August 17, 2022 1:17 PM
To: hr@bu.edu [hr@bu.edu]
Subject: Tuition remission form U08398507
Hello,
Attached is the tuition remission form for fall 2022.
Thanks,John De los Santos

---

**John De Los Santos** <johndls@bu.edu>                                        Fri, Aug 19, 2022 at 10:44 AM
To: hr@bu.edu

Hello,

Thanks so much,

John De los Santos

On Fri, Aug 19, 2022 at 10:38 AM Human Resources <hr@bu.edu> wrote:

Hello John,

The Tuition Remission Benefit has been processed for Fall 2022 semester. Let me know if we can be of further assistance.

Sincerely,

Kari Arita
**Boston University** Human Resources
http://www.bu.edu/hr/

Send BU Human Resources a secure email

-----Original Message-----
From: "Human Resources"
Sent: Friday, August 19, 2022 8:43 AM
To: johndls@bu.edu
Subject: Re: About Case 228630: Re: Tuition remission form U08398507

Hi John,

Your Tuition Remission Application is currently under review. I will email you once the review is complete.

Sincerely,

Kari Arita
**Boston University** Human Resources
http://www.bu.edu/hr/

12/9/24, 4:32 PM                    Boston University Mail - About Case 228630: Re: Tuition remission form U08398507

Send BU Human Resources a secure email

.

From: johndls@bu.edu [johndls@bu.edu]
Sent: Thursday, August 18, 2022 10:18 AM
To: hr@bu.edu [hr@bu.edu]
Subject: Re: About Case 228630: Re: Tuition remission form U08398507
Hello,
Previously, I was informed that regardless of his termination he has retiree status. That is because he was over 55
years old and worked at BU more than 10 years the tuition remission benefit still applies. I was informed that I would
only need to submit the physical copy instead of the web format and have been doing so.
Thanks,John De los Santos

On Thu, Aug 18, 2022 at 9:14 AM Human Resources <hr@bu.edu> wrote:

Hello John,

Thank you for sending your son's Tuition Remission Application.

Your father's appointment ended with the University on 11-20-2021 by means of involuntary retirement.  Because of
this, him and his dependents are no longer eligible for the Tuition Remission Benefit.

Let me know if you have any questions.

Sincerely,

Kari Arita
**Boston University** Human Resources
http://www.bu.edu/hr/

Send BU Human Resources a secure email

From: johndls@bu.edu [johndls@bu.edu]
Sent: Wednesday, August 17, 2022 1:17 PM
To: hr@bu.edu [hr@bu.edu]
Subject: Tuition remission form U08398507
Hello,
Attached is the tuition remission form for fall 2022.
Thanks,John De los Santos

---

**John De Los Santos** <johndls@bu.edu>                                    Mon, Dec 2, 2024 at 5:34 PM
To: "juandelossantos624@gmail.com" <juandelossantos624@gmail.com>

---------- Forwarded message ----------
From: **Human Resources** <hr@bu.edu>
Date: Thu, Aug 18, 2022 at 9:14 AM
Subject: About Case 228630: Re: Tuition remission form U08398507
To: <johndls@bu.edu>

Hello John,

Thank you for sending your son's Tuition Remission Application.

Your father's appointment ended with the University on 11-20-2021 by means of involuntary retirement.  Because of this,
him and his dependents are no longer eligible for the Tuition Remission Benefit.

Let me know if you have any questions.

Sincerely,

Kari Arita
**Boston University** Human Resources
http://www.bu.edu/hr/

Send BU Human Resources a secure email


-----Original Message-----
From: johndls@bu.edu
Sent: Wednesday, August 17, 2022 1:17 PM
To: hr@bu.edu
Subject: Tuition remission form U08398507
Hello,
Attached is the tuition remission form for fall 2022.
Thanks,John De los Santos

12/13/24, 3:37 PM

Boston University
Name: John De Los Santos
Id: U08398507

Student Account Details

Institution: Boston University
Retrieved at: 2024-12-13 15:37:52-06:00

Term:
Start Date: -
End Date: -

## Activity

| DESCRIPTION | ACTIVITY TYPE | DATE | TERM | AMOUNT |
|---|---|---|---|---|
| EPAY-Check Payment | PAYMENT | 06/18/2024 | Fall 2024 | $25.00 |
| Convenience Points Purchase | CHARGE | 05/14/2024 | Spring 2024 | $25.00 |
| Electronic Refund | CHARGE | 04/01/2024 | Spring 2024 | $3,750.00 |
| EPAY-Check Payment | PAYMENT | 03/16/2024 | Spring 2024 | $3,950.53 |
| First Day Course Materials | CHARGE | 02/27/2024 | Spring 2024 | $78.04 |
| First Day Course Materials | CHARGE | 02/27/2024 | Spring 2024 | $122.49 |
| EPAY-Check Payment | PAYMENT | 02/10/2024 | Spring 2024 | $2,474.90 |
| EPAY-Check Payment | PAYMENT | 01/22/2024 | Spring 2024 | $5,000.00 |
| EPAY-Check Payment | PAYMENT | 01/10/2024 | Spring 2024 | $3,750.00 |
| Tuition Remission | PAYMENT | 01/05/2024 | Spring 2024 | $28,709.10 |
| Gilbert (Mass) Matching Grant | PAYMENT | 01/03/2024 | Spring 2024 | $1,250.00 |
| Student Scholarship | PAYMENT | 01/03/2024 | Spring 2024 | $2,800.00 |
| Apartment Plan | CHARGE | 11/03/2023 | Spring 2024 | $1,390.00 |
| Community Fee-Undergrad | CHARGE | 11/03/2023 | Spring 2024 | $70.00 |
| Health & Wellness Fee | CHARGE | 11/03/2023 | Spring 2024 | $257.00 |
| Residence Charge-Room | CHARGE | 11/03/2023 | Spring 2024 | $10,010.00 |
| Student Services Fee | CHARGE | 11/03/2023 | Spring 2024 | $358.00 |
| Tuition-Undergraduate | CHARGE | 11/03/2023 | Spring 2024 | $31,899.00 |
| Electronic Refund | CHARGE | 11/14/2023 | Fall 2023 | $3,750.00 |
| EPAY-Check Payment | PAYMENT | 10/31/2023 | Fall 2023 | $3,750.00 |
| EPAY-Check Payment | PAYMENT | 10/26/2023 | Fall 2023 | $1,067.44 |
| Apartment Plan | CHARGE | 10/04/2023 | Fall 2023 | $1,042.44 |
| Gilbert (Mass) Matching Grant | PAYMENT | 09/22/2023 | Fall 2023 | $1,250.00 |
| Student Scholarship | PAYMENT | 09/22/2023 | Fall 2023 | $2,800.00 |
| Convenience Points Purchases | CHARGE | 09/12/2023 | Fall 2023 | $25.00 |
| EPAY-Check Payment | PAYMENT | 09/04/2023 | Fall 2023 | $947.90 |
| EPAY-Check Payment | PAYMENT | 09/04/2023 | Fall 2023 | $3,750.00 |
| Health Insurance Waived | PAYMENT | 09/04/2023 | Fall 2023 | $3,280.00 |
| Tuition Remission | PAYMENT | 08/24/2023 | Fall 2023 | $28,709.10 |
| Sports Pass Rejection | PAYMENT | 08/14/2023 | Fall 2023 | $140.00 |
| Community Fee-Undergrad | CHARGE | 06/07/2023 | Fall 2023 | $70.00 |
| Health & Wellness Fee | CHARGE | 06/07/2023 | Fall 2023 | $257.00 |
| Health Insurance-Basic Plan | CHARGE | 06/07/2023 | Fall 2023 | $3,280.00 |
| Residence Charge-Room | CHARGE | 06/07/2023 | Fall 2023 | $10,010.00 |
| Sports Pass | CHARGE | 06/07/2023 | Fall 2023 | $140.00 |
| Student Services Fee | CHARGE | 06/07/2023 | Fall 2023 | $358.00 |
| Tuition-Undergraduate | CHARGE | 06/07/2023 | Fall 2023 | $31,899.00 |
| Housing Guarantee Payment | PAYMENT | 02/08/2023 | Fall 2023 | $600.00 |
| Federal Pell Grant | PAYMENT | 09/05/2023 | Summer 2 2023 | $1,723.00 |
| Tuition Remission | PAYMENT | 05/23/2023 | Summer 2 2023 | $5,580.00 |
| Student Services Fee-Summer | CHARGE | 05/17/2023 | Summer 2 2023 | $60.00 |
| Tuition | CHARGE | 05/17/2023 | Summer 2 2023 | $3,100.00 |

12/13/24, 3:37 PM

## Student Account Details

| Description | Type | Date | Term | Amount |
|---|---|---|---|---|
| Housing Guarantee Payment | PAYMENT | 03/01/2022 | Fall 2022 | $600.00 |
| Late Payment Fee | CHARGE | 07/12/2022 | Summer 2 2022 | $75.00 |
| EPAY-Check Payment | PAYMENT | 07/11/2022 | Summer 2 2022 | $1,773.00 |
| Lab Fee | CHARGE | 05/23/2022 | Summer 2 2022 | $200.00 |
| Tuition | CHARGE | 05/23/2022 | Summer 2 2022 | $3,020.00 |
| Student Services Fee-Summer | CHARGE | 05/05/2022 | Summer 2 2022 | $60.00 |
| Tuition | CHARGE | 05/05/2022 | Summer 2 2022 | $3,020.00 |
| Tuition Remission | PAYMENT | 05/25/2022 | Summer 1 2022 | $10,872.00 |
| Tuition | CHARGE | 05/04/2022 | Summer 1 2022 | -$3,020.00 |
| Tuition | CHARGE | 05/04/2022 | Summer 1 2022 | $3,020.00 |
| Tuition | CHARGE | 05/04/2022 | Summer 1 2022 | $3,020.00 |
| Student Services Fee-Summer | CHARGE | 05/02/2022 | Summer 1 2022 | $60.00 |
| Tuition | CHARGE | 05/02/2022 | Summer 1 2022 | $3,020.00 |
| Late Payment Fee | CHARGE | 08/31/2022 | Spring 2022 | -$400.00 |
| Residence Lock/Key Charge | CHARGE | 06/29/2022 | Spring 2022 | $120.00 |
| Convenience Points Purchases | CHARGE | 04/26/2022 | Spring 2022 | $25.00 |
| Convenience Points Purchases | CHARGE | 03/14/2022 | Spring 2022 | $25.00 |
| Late Payment Fee | CHARGE | 02/08/2022 | Spring 2022 | $400.00 |
| EPAY-Check Payment | PAYMENT | 02/07/2022 | Spring 2022 | $1,552.59 |
| EPAY-Check Payment | PAYMENT | 01/30/2022 | Spring 2022 | $1,500.00 |
| Convenience Points Purchases | CHARGE | 01/24/2022 | Spring 2022 | $25.00 |
| EPAY-Check Payment | PAYMENT | 01/19/2022 | Spring 2022 | $3,000.00 |
| Restricted Tuition Credit | PAYMENT | 01/18/2022 | Spring 2022 | $28,427.00 |
| Health Insurance Waived | PAYMENT | 01/14/2022 | Spring 2022 | $1,891.00 |
| Community Fee-Undergrad | CHARGE | 01/12/2022 | Spring 2022 | $64.00 |
| Health & Wellness Fee | CHARGE | 01/12/2022 | Spring 2022 | $235.00 |
| Health Insurance-Basic Plan | CHARGE | 01/12/2022 | Spring 2022 | $1,891.00 |
| Student Services Fee | CHARGE | 01/12/2022 | Spring 2022 | $329.00 |
| Tuition-Undergraduate | CHARGE | 01/12/2022 | Spring 2022 | $29,280.00 |
| Residence Charge-Room | CHARGE | 01/07/2022 | Spring 2022 | $7,255.00 |
| Housing Guarantee Payment | PAYMENT | 12/06/2021 | Spring 2022 | $600.00 |
| Housing Guarantee Forfeit | CHARGE | 08/27/2021 | Fall 2021 | $600.00 |
| Residence Charge-Room | CHARGE | 08/27/2021 | Fall 2021 | -$7,255.00 |
| Residence Charge-Room | CHARGE | 06/08/2021 | Fall 2021 | $7,255.00 |
| Housing Guarantee Payment | PAYMENT | 02/28/2021 | Fall 2021 | $600.00 |
| Balance As Of Summer 2, 2021 | PAYMENT | 04/22/2021 | Summer 2 2021 | $2,508.41 |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JUAN DE LOS SANTOS                    )    No. 23-CV-11305-DJC
        PLAINTIFF,                    )
V.                                    )
                                      )
SERVICE EMPLOYEES and INTERNATIONAL   )
UNION LOCAL 615 32BJ and BOSTON UNIVERSITY )
                                      )
       DEFENDANTS,                     )

## AFFIDAVIT OF JOHN NOEL DE LOS SANTOS

I, John Noel De Los Santos, hereby depose and state that the following statements and facts are true and correct under the pains and penalties of perjury in accordance with Federal laws, and statutes, as well as under Massachusetts State laws.

1.   My name is John Noel De Los Santos, and I am an adult of sound mind above the age of 18.

2.   I am the son of the plaintiff, Juan Delossantos, and a prospective graduate of Boston University's class of 2024, who attended the graduation Ceremony in June of 2024. My BU Student ID Number is U08398507. See Exhibit "3."

3.   I have also been a visiting student completing my final studies. See photos of myself with my cap and gown;

            attached herein as Exhibits "2".

4.   On Thu, Aug 18, 2022, at 9:09 AM I received an email response from Boston University's Human Resources office, and was originally told, "Your father's appointment ended with the University on 11-20-2021 by means of involuntary retirement. Because of this, he and his dependents are no longer eligible for the Tuition Remission Benefit. Let me know if you have any questions." Sincerely, Kari Arita. See Exhibit "1."    The Human Resources Office

1

provided with me a claim/Case Number About Case 228630: Re: Tuition remission form U08398507.

Knowing that my father was wrongfully framed and accused of sexual harassment by a co—worker and others that also complained that my father was awkward simply because he spoke with a thick accent, and other linguistic and cultural discriminatory acts he experienced by co-workers; I further emailed and contacted the Human Resources Office of Boston University to advocate on my father's behalf to obtain a tuition waiver.

5.    On Friday, Aug 19, 2022, at 10:38 AM Reply-To: hr@bu.edu To: johndls@bu.edu BU's HR Office, emailed me by stating **"Hello John, The Tuition Remission Benefit has been processed for Fall 2022 semester. Let me know if we can be of further assistance". Sincerely, Kari Arita Boston University Human Resources."** See Exhibit "1" herein.

6.    I am willing and able to testify, that I reasonably believe that Boston University's Human Resources office, through written emails attached herein, reconsidered their decision to categorize my father's status as a terminated employee, to be in good standing, and granted me as plaintiff's son and dependent a 90 percent tuition waiver, which it is my understanding could not have been awarded to me, had my father remained in a terminated status of employment.

7.    Included as part of my award of financial Aid are Federal Pell grants, and other federally regulated scholarships and grants from the US Department of Education.  See Exhibit "3."

8.    Previously and before I requested, and as granted a 90 percent tuition waiver, my father's employment was coded and categorized as a terminated employee, and BU's Human Resources Office, even authored emails to me that my father's status as an employee is not in good standing.

9.    I am willing and able to testify to the lost wages that my father had been deprived of in the amount of roughly $ 60,000 per year over the last four years, totaling  $ 240,000 as well as

psychological harm, he has suffered for being accused of sexual harassment when he cannot at times even be understood due to his thick accent and English as a secondary language.

10.    I am also willing to testify that to the best of my knowledge my father was never given an Employee Handbooks, or the right to request the work clothes of accuser to establish the absence of my father's (the plaintiff's); DNA, fingerprints, or to be permitted to cross examine his accusers through an Interpreter because he is a Dominican Spanish native from the Dominican Republic as explained to me by my father.

11.    As a happily married family person who always supports me and worked to clean and mop the floors of defendant Boston University among other tasks so I as his son, and my two sisters can achieve a Bachelor's Degree and additional higher education; my father as an immigrant has been maliciously prosecuted and discriminated against on the basis of his Communication Disabilities and Linguistic Disabilities by Boston University's Title IX Office, and neglected by his Union, which wrongfully dismissed him when none of the facts of my sworn Affidavit were ever before the Union, the Title IX Office, of this Honorable Federal Court.

12.    My father has been an active member of the Basilica of Our Lady of Perpetual Help located at 1545 Tremont Street Boston, MA 02120 since 1985 when he immigrated to the United States from the Dominican Republic. See letter from Reverand Sean McGillicuddy, C.S.S.R. attached as Exhibit "4" herein. My father was never informed by BU as his employer or his Union, that he could have called Reverand Sean McGillicuddy, C.S.S.R. as a witness to the Title IX hearings or this Court prior to this Court's dismissal of the defendant Union from his case.

13.    My father was never informed or advised, in Spanish or English or offered an interpreter to advise him, that he had the right to call his family members to the Title IX hearing, or to have me as his son testify that Boston University granted me as his dependent son 90 percent tuition

3

remission benefit after I advocated for my father's tenure and long term employment which the Human Resources Office that previously wrongfully terminated him, granted me a 90 percent tuition waiver superseding and vacating the previous decision to terminate, as I am advised that tuition waiver could not be lawfully granted if my father was not in good standing as explained by my father's Attorney and Legal Consultant.

14. I am willing to testify that my father had intended to request his employer Boston University (the University) as a institute of higher education, to relocate his employment as a janitor to one of three principal campuses: the Charles River Campus in the Back Bay, the Fenway Campus in Boston, and/or the Medical Campus in the South End, which he was not aware how to request nor was he ever provided with an Employee Handbook which he could read and understand.

15. I am willing and able to testify as to the facts and statements, and attachments within this Sworn Affidavit to the best of my ability either in open court, or by Zoom video, before a Judge, or a Jury, or a Mediator or Defendant's attorney or any other forum if my live testimony is needed in any way.

Sworn to under the pains and penalties of perjury on this 17th day of December of 2024.

John De Los Santos

**John De Los Santos**

·4

# EXHIBIT "1"

12/9/24, 4:32 PM                        Boston University Mail – About Case 228630: Re: Tuition remission form U08398507



John De Los Santos <johndls@bu.edu>

---

## About Case 228630: Re: Tuition remission form U08398507
6 messages

---

**Human Resources** <hr@bu.edu>                                      Thu, Aug 18, 2022 at 9:09 AM
Reply-To: hr@bu.edu
To: johndls@bu.edu

Hello John,

Thank you for sending your son's Tuition Remission Application.

Your father's appointment ended with the University on 11-20-2021 by means of involuntary retirement. Because of this, him and his dependents are no longer eligible for the Tuition Remission Benefit.

Let me know if you have any questions.

Sincerely,

Kari Arita
**Boston University** Human Resources
http://www.bu.edu/hr/

Send BU Human Resources a secure email


-----Original Message-----
From: johndls@bu.edu
Sent: Wednesday, August 17, 2022 1:17 PM
To: hr@bu.edu
Subject: Tuition remission form U08398507
Hello,
Attached is the tuition remission form for fall 2022.
Thanks,John De los Santos

---

**John De los Santos** <johndls@bu.edu>                               Thu, Aug 18, 2022 at 10:18 AM
To: hr@bu.edu

Hello,

Previously, I was informed that regardless of his termination he has retiree status. That is because he was over 55 years old and worked at BU more than 10 years the tuition remission benefit still applies. I was informed that I would only need to submit the physical copy instead of the web format and have been doing so.

Thanks,
John De los Santos


On Thu, Aug 18, 2022 at 9:14 AM Human Resources <hr@bu.edu> wrote:

    Hello John,

    Thank you for sending your son's Tuition Remission Application.

    Your father's appointment ended with the University on 11-20-2021 by means of involuntary retirement. Because of this, him and his dependents are no longer eligible for the Tuition Remission Benefit.

    Let me know if you have any questions.

Sincerely,

Kari Arita
**Boston University** Human Resources
http://www.bu.edu/hr/

Send BU Human Resources a secure email

----Original Message----
From: johndls@bu.edu
Sent: Wednesday, August 17, 2022 1:17 PM
To: hr@bu.edu
Subject: Tuition remission form U08398507
Hello,
Attached is the tuition remission form for fall 2022.
Thanks,John De los Santos

---

**Human Resources** <hr@bu.edu>                                        Fri, Aug 19, 2022 at 8:43 AM
Reply-To: hr@bu.edu
To: johndls@bu.edu

Hi John,

Your Tuition Remission Application is currently under review.  I will email you once the review is complete.

Sincerely,

Kari Arita
**Boston University** Human Resources
http://www.bu.edu/hr/

Send BU Human Resources a secure email

----Original Message----
From: johndls@bu.edu
Sent: Thursday, August 18, 2022 10:18 AM
To: hr@bu.edu
Subject: Re: About Case 228630: Re: Tuition remission form U08398507
Hello,
Previously, I was informed that regardless of his termination he has retiree status. That is because he was over 55 years
old and worked at BU more than 10 years the tuition remission benefit still applies. I was informed that I would only need
to submit the physical copy instead of the web format and have been doing so.
Thanks,John De los Santos

On Thu, Aug 18, 2022 at 9:14 AM Human Resources <hr@bu.edu> wrote:

Hello John,

Thank you for sending your son's Tuition Remission Application.

Your father's appointment ended with the University on 11-20-2021 by means of involuntary retirement.  Because of this,
him and his dependents are no longer eligible for the Tuition Remission Benefit.

Let me know if you have any questions.

Sincerely,

Kari Arita
**Boston University** Human Resources
http://www.bu.edu/hr/

Send BU Human Resources a secure email

From: johndls@bu.edu [johndls@bu.edu]
Sent: Wednesday, August 17, 2022 1:17 PM
To: hr@bu.edu [hr@bu.edu]
Subject: Tuition remission form U08398507
Hello,
Attached is the tuition remission form for fall 2022.
Thanks,John De los Santos

---

**Human Resources <hr@bu.edu>**                                                        Fri, Aug 19, 2022 at 10:38 AM
Reply-To: hr@bu.edu
To: johndls@bu.edu

Hello John,

The Tuition Remission Benefit has been processed for Fall 2022 semester. Let me know if we can be of further
assistance.

Sincerely,

Kari Arita
**Boston University** Human Resources
http://www.bu.edu/hr/

Send BU Human Resources a secure email

------Original Message------
From: "Human Resources"
Sent: Friday, August 19, 2022 8:43 AM
To: johndls@bu.edu
Subject: Re: About Case 228630: Re: Tuition remission form U08398507

Hi John,

Your Tuition Remission Application is currently under review. I will email you once the review is complete.

Sincerely,

Kari Arita
**Boston University** Human Resources
http://www.bu.edu/hr/

Send BU Human Resources a secure email

From: johndls@bu.edu [johndls@bu.edu]
Sent: Thursday, August 18, 2022 10:18 AM
To: hr@bu.edu [hr@bu.edu]
Subject: Re: About Case 228630: Re: Tuition remission form U08398507
Hello,
Previously, I was informed that regardless of his termination he has retiree status. That is because he was over 55 years
old and worked at BU more than 10 years the tuition remission benefit still applies. I was informed that I would only need
to submit the physical copy instead of the web format and have been doing so.
Thanks,John De los Santos

On Thu, Aug 18, 2022 at 9:14 AM Human Resources <hr@bu.edu> wrote:

Hello John,

12/9/24, 4:32 PM                              Boston University Mail - About Case 228630: Re: Tuition remission form U08398507

Thank you for sending your son's Tuition Remission Application.

Your father's appointment ended with the University on 11-20-2021 by means of involuntary retirement. Because of this, him and his dependents are no longer eligible for the Tuition Remission Benefit.

Let me know if you have any questions.

Sincerely,

Kari Arita
**Boston University** Human Resources
http://www.bu.edu/hr/

Send BU Human Resources a secure email

From: johndls@bu.edu [johndls@bu.edu]
Sent: Wednesday, August 17, 2022 1:17 PM
To: hr@bu.edu [hr@bu.edu]
Subject: Tuition remission form U08398507
Hello,
Attached is the tuition remission form for fall 2022.
Thanks, John De los Santos

**John De Los Santos** <johndls@bu.edu>                                              Fri, Aug 19, 2022 at 10:44 AM
To: hr@bu.edu

Hello,

Thanks so much,

John De los Santos

On Fri, Aug 19, 2022 at 10:38 AM Human Resources <hr@bu.edu> wrote:

: Hello John,

: The Tuition Remission Benefit has been processed for Fall 2022 semester.  Let me know if we can be of further
: assistance.

: Sincerely,

: Kari Arita
: **Boston University** Human Resources
: http://www.bu.edu/hr/

: Send BU Human Resources a secure email

: -----Original Message-----
: From: "Human Resources"
: Sent: Friday, August 19, 2022 8:43 AM
: To: johndls@bu.edu
: Subject: Re: About Case 228630: Re: Tuition remission form U08398507

: Hi John,

: Your Tuition Remission Application is currently under review.  I will email you once the review is complete.

: Sincerely,

: Kari Arita
: **Boston University** Human Resources
: http://www.bu.edu/hr/

12/9/24, 4:32 PM                         Boston University Mail - About Case 228630: Re: Tuition remission form U08398507

Send BU Human Resources a secure email

From: johndls@bu.edu [johndls@bu.edu]
Sent: Thursday, August 18, 2022 10:18 AM
To: hr@bu.edu [hr@bu.edu]
Subject: Re: About Case 228630: Re: Tuition remission form U08398507
Hello,
Previously, I was informed that regardless of his termination he has retiree status. That is because he was over 55
years old and worked at BU more than 10 years the tuition remission benefit still applies. I was informed that I would
only need to submit the physical copy instead of the web format and have been doing so.
Thanks, John De los Santos

On Thu, Aug 18, 2022 at 9:14 AM Human Resources <hr@bu.edu> wrote:

Hello John,

Thank you for sending your son's Tuition Remission Application.

Your father's appointment ended with the University on 11-20-2021 by means of involuntary retirement. Because of
this, him and his dependents are no longer eligible for the Tuition Remission Benefit.

Let me know if you have any questions.

Sincerely,

Karl Arita
**Boston University** Human Resources
http://www.bu.edu/hr/

Send BU Human Resources a secure email

From: johndls@bu.edu [johndls@bu.edu]
Sent: Wednesday, August 17, 2022 1:17 PM
To: hr@bu.edu [hr@bu.edu]
Subject: Tuition remission form U08398507
Hello,
Attached is the tuition remission form for fall 2022.
Thanks, John De los Santos

---

**John De Los Santos** <johndls@bu.edu>                                       Mon, Dec 2, 2024 at 5:34 PM
To: "juandelossantos624@gmail.com" <juandelossantos624@gmail.com>

———— Forwarded message ————
From: **Human Resources** <hr@bu.edu>
Date: Thu, Aug 18, 2022 at 9:14 AM
Subject: About Case 228630: Re: Tuition remission form U08398507
To: <johndls@bu.edu>

Hello John,

Thank you for sending your son's Tuition Remission Application.

Your father's appointment ended with the University on 11-20-2021 by means of involuntary retirement. Because of this,
him and his dependents are no longer eligible for the Tuition Remission Benefit.

12/9/24, 4:32 PM                                Boston University Mail - About Case 228630: Re: Tuition remission form U08398507

Let me know if you have any questions.

Sincerely,

Karl Arita
**Boston University** Human Resources
http://www.bu.edu/hr/

Send BU Human Resources a secure email


-----Original Message-----
From: johndls@bu.edu
Sent: Wednesday, August 17, 2022 1:17 PM
To: hr@bu.edu
Subject: Tuition remission form U08398507
Hello,
Attached is the tuition remission form for fall 2022.
Thanks,John De los Santos

# EXHIBIT "2"



# EXHIBIT "3"

12/13/24, 3:37 PM

Boston University
Name: John De Los Santos
Id: U08398507

Student Account Details

Institution: Boston University
Retrieved at: 2024-12-13 15:37:52-05:00

Term:
Start Date: -
End Date: -

## Activity

| DESCRIPTION | ACTIVITY TYPE | DATE | TERM | AMOUNT |
|---|---|---|---|---|
| EPAY-Check Payment | PAYMENT | 06/18/2024 | Fall 2024 | $25.00 |
| Convenience Points Purchase | CHARGE | 05/14/2024 | Spring 2024 | $25.00 |
| Electronic Refund | CHARGE | 04/01/2024 | Spring 2024 | $3,750.00 |
| EPAY-Check Payment | PAYMENT | 03/15/2024 | Spring 2024 | $3,950.53 |
| First Day Course Materials | CHARGE | 02/27/2024 | Spring 2024 | $78.04 |
| First Day Course Materials | CHARGE | 02/27/2024 | Spring 2024 | $122.49 |
| EPAY-Check Payment | PAYMENT | 02/10/2024 | Spring 2024 | $2,474.90 |
| EPAY-Check Payment | PAYMENT | 01/22/2024 | Spring 2024 | $5,000.00 |
| EPAY-Check Payment | PAYMENT | 01/10/2024 | Spring 2024 | $3,750.00 |
| Tuition Remission | PAYMENT | 01/05/2024 | Spring 2024 | $28,709.10 |
| Gilbert (Mass) Matching Grant | PAYMENT | 01/03/2024 | Spring 2024 | $1,250.00 |
| Student Scholarship | PAYMENT | 01/03/2024 | Spring 2024 | $2,800.00 |
| Apartment Plan | CHARGE | 11/03/2023 | Spring 2024 | $1,390.00 |
| Community Fee-Undergrad | CHARGE | 11/03/2023 | Spring 2024 | $70.00 |
| Health & Wellness Fee | CHARGE | 11/03/2023 | Spring 2024 | $257.00 |
| Residence Charge-Room | CHARGE | 11/03/2023 | Spring 2024 | $10,010.00 |
| Student Services Fee | CHARGE | 11/03/2023 | Spring 2024 | $358.00 |
| Tuition-Undergraduate | CHARGE | 11/03/2023 | Spring 2024 | $31,899.00 |
| Electronic Refund | CHARGE | 11/14/2023 | Fall 2023 | $3,750.00 |
| EPAY-Check Payment | PAYMENT | 10/31/2023 | Fall 2023 | $3,750.00 |
| EPAY-Check Payment | PAYMENT | 10/26/2023 | Fall 2023 | $1,067.44 |
| Apartment Plan | CHARGE | 10/04/2023 | Fall 2023 | $1,042.44 |
| Gilbert (Mass) Matching Grant | PAYMENT | 09/22/2023 | Fall 2023 | $1,250.00 |
| Student Scholarship | PAYMENT | 09/22/2023 | Fall 2023 | $2,800.00 |
| Convenience Points Purchases | CHARGE | 09/12/2023 | Fall 2023 | $25.00 |
| EPAY-Check Payment | PAYMENT | 09/04/2023 | Fall 2023 | $947.90 |
| EPAY-Check Payment | PAYMENT | 09/04/2023 | Fall 2023 | $3,750.00 |
| Health Insurance Waived | PAYMENT | 09/04/2023 | Fall 2023 | $3,280.00 |
| Tuition Remission | PAYMENT | 08/24/2023 | Fall 2023 | $28,709.10 |
| Sports Pass Rejection | PAYMENT | 08/14/2023 | Fall 2023 | $140.00 |
| Community Fee-Undergrad | CHARGE | 06/07/2023 | Fall 2023 | $70.00 |
| Health & Wellness Fee | CHARGE | 06/07/2023 | Fall 2023 | $257.00 |
| Health Insurance-Basic Plan | CHARGE | 06/07/2023 | Fall 2023 | $3,280.00 |
| Residence Charge-Room | CHARGE | 06/07/2023 | Fall 2023 | $10,010.00 |
| Sports Pass | CHARGE | 06/07/2023 | Fall 2023 | $140.00 |
| Student Services Fee | CHARGE | 06/07/2023 | Fall 2023 | $358.00 |
| Tuition-Undergraduate | CHARGE | 06/07/2023 | Fall 2023 | $31,899.00 |
| Housing Guarantee Payment | PAYMENT | 02/08/2023 | Fall 2023 | $600.00 |
| Federal Pell Grant | PAYMENT | 09/05/2023 | Summer 2 2023 | $1,723.00 |
| Tuition Remission | PAYMENT | 05/23/2023 | Summer 2 2023 | $5,580.00 |
| Student Services Fee-Summer | CHARGE | 05/17/2023 | Summer 2 2023 | $60.00 |
| Tuition | CHARGE | 05/17/2023 | Summer 2 2023 | $3,100.00 |

12/13/24, 3:37 PM

## Student Account Details

| Description | Type | Date | Term | Amount |
| --- | --- | --- | --- | --- |
| Tuition | CHARGE | 05/17/2023 | Summer 2 2023 | $3,100.00 |
| Student Services Fee-Summer | CHARGE | 03/20/2023 | Summer 2 2023 | -$60.00 |
| Tuition | CHARGE | 03/20/2023 | Summer 2 2023 | -$3,100.00 |
| Student Services Fee-Summer | CHARGE | 03/15/2023 | Summer 2 2023 | $60.00 |
| Tuition | CHARGE | 03/15/2023 | Summer 2 2023 | $3,100.00 |
| Federal Pell Grant | PAYMENT | 08/31/2023 | Summer 1 2023 | $1,724.00 |
| Tuition Remission | PAYMENT | 05/23/2023 | Summer 1 2023 | $11,150.00 |
| Tuition Remission | PAYMENT | 05/23/2023 | Summer 1 2023 | $5,580.00 |
| Tuition Remission Reversal | CHARGE | 05/23/2023 | Summer 1 2023 | $11,160.00 |
| Tuition | CHARGE | 05/17/2023 | Summer 1 2023 | $3,100.00 |
| Student Services Fee-Summer | CHARGE | 05/11/2023 | Summer 1 2023 | $60.00 |
| Tuition | CHARGE | 05/11/2023 | Summer 1 2023 | $3,100.00 |
| Student Services Fee-Summer | CHARGE | 03/20/2023 | Summer 1 2023 | -$60.00 |
| Tuition | CHARGE | 03/20/2023 | Summer 1 2023 | -$3,100.00 |
| Student Services Fee-Summer | CHARGE | 03/15/2023 | Summer 1 2023 | $60.00 |
| Tuition | CHARGE | 03/15/2023 | Summer 1 2023 | $3,100.00 |
| Student Room/Apartment Damage | CHARGE | 06/16/2023 | Spring 2023 | $25.00 |
| Convenience Points Purchase | CHARGE | 05/09/2023 | Spring 2023 | $25.00 |
| Massachusetts State Grant | PAYMENT | 04/11/2023 | Spring 2023 | $1,400.00 |
| Gilbert (Mass) Matching Grant | PAYMENT | 03/09/2023 | Spring 2023 | $1,250.00 |
| EPAY-Check Payment | PAYMENT | 01/23/2023 | Spring 2023 | $295.50 |
| Federal Pell Grant | PAYMENT | 01/22/2023 | Spring 2023 | $3,447.00 |
| Federal SEOG Grant | PAYMENT | 01/19/2023 | Spring 2023 | $1,250.00 |
| EPAY-Check Payment | PAYMENT | 12/19/2022 | Spring 2023 | $3,750.00 |
| Tuition Remission | PAYMENT | 12/13/2022 | Spring 2023 | $27,472.50 |
| Student Scholarship | PAYMENT | 11/12/2022 | Spring 2023 | $2,745.00 |
| Community Fee-Undergrad | CHARGE | 11/11/2022 | Spring 2023 | $67.00 |
| Health & Wellness Fee | CHARGE | 11/11/2022 | Spring 2023 | $245.00 |
| Student Services Fee | CHARGE | 11/11/2022 | Spring 2023 | $343.00 |
| Tuition-Undergraduate | CHARGE | 11/11/2022 | Spring 2023 | $30,525.00 |
| Optional-Dining Plan | CHARGE | 11/03/2022 | Spring 2023 | $3,070.00 |
| Residence Charge-Room | CHARGE | 11/03/2022 | Spring 2023 | $7,510.00 |
| Gilbert (Mass) Matching Grant | PAYMENT | 03/09/2023 | Fall 2022 | $1,250.00 |
| Massachusetts State Grant | PAYMENT | 01/25/2023 | Fall 2022 | $1,400.00 |
| Student Scholarship | PAYMENT | 10/06/2022 | Fall 2022 | $2,745.00 |
| Student Scholarship | PAYMENT | 10/06/2022 | Fall 2022 | -$2,745.00 |
| Federal Pell Grant | PAYMENT | 09/12/2022 | Fall 2022 | $9,448.00 |
| EPAY-Check Payment | PAYMENT | 09/03/2022 | Fall 2022 | $2,094.50 |
| EPAY-Check Payment | PAYMENT | 09/02/2022 | Fall 2022 | $3,750.00 |
| Federal SEOG Grant | PAYMENT | 09/01/2022 | Fall 2022 | $1,250.00 |
| Student Scholarship | PAYMENT | 08/30/2022 | Fall 2022 | $2,745.00 |
| Tuition Remission | PAYMENT | 08/19/2022 | Fall 2022 | $27,472.50 |
| Health Insurance Waived | PAYMENT | 08/16/2022 | Fall 2022 | $3,235.00 |
| Optional-Dining Plan | CHARGE | 08/15/2022 | Fall 2022 | $3,070.00 |
| Sports Pass Rejection | PAYMENT | 08/15/2022 | Fall 2022 | $130.00 |
| Community Fee-Undergrad | CHARGE | 06/07/2022 | Fall 2022 | $67.00 |
| Health & Wellness Fee | CHARGE | 06/07/2022 | Fall 2022 | $245.00 |
| Health Insurance-Basic Plan | CHARGE | 06/07/2022 | Fall 2022 | $3,235.00 |
| Residence Charge-Room | CHARGE | 06/07/2022 | Fall 2022 | $7,510.00 |
| Sports Pass | CHARGE | 06/07/2022 | Fall 2022 | $130.00 |
| Student Services Fee | CHARGE | 06/07/2022 | Fall 2022 | $343.00 |
| Tuition-Undergraduate | CHARGE | 06/07/2022 | Fall 2022 | $30,525.00 |

12/13/24, 3:37 PM

Student Account Details

| Description | Type | Date | Term | Amount |
|---|---|---|---|---|
| Housing Guarantee Payment | PAYMENT | 03/01/2022 | Fall 2022 | $600.00 |
| Late Payment Fee | CHARGE | 07/12/2022 | Summer 2 2022 | $75.00 |
| EPAY-Check Payment | PAYMENT | 07/11/2022 | Summer 2 2022 | $1,773.00 |
| Lab Fee | CHARGE | 05/23/2022 | Summer 2 2022 | $200.00 |
| Tuition | CHARGE | 05/23/2022 | Summer 2 2022 | $3,020.00 |
| Student Services Fee-Summer | CHARGE | 05/05/2022 | Summer 2 2022 | $60.00 |
| Tuition | CHARGE | 05/05/2022 | Summer 2 2022 | $3,020.00 |
| Tuition Remission | PAYMENT | 05/25/2022 | Summer 1 2022 | $10,872.00 |
| Tuition | CHARGE | 05/04/2022 | Summer 1 2022 | -$3,020.00 |
| Tuition | CHARGE | 05/04/2022 | Summer 1 2022 | $3,020.00 |
| Tuition | CHARGE | 05/04/2022 | Summer 1 2022 | $3,020.00 |
| Student Services Fee-Summer | CHARGE | 05/02/2022 | Summer 1 2022 | $60.00 |
| Tuition | CHARGE | 05/02/2022 | Summer 1 2022 | $3,020.00 |
| Late Payment Fee | CHARGE | 08/31/2022 | Spring 2022 | -$400.00 |
| Residence Lock/Key Charge | CHARGE | 06/29/2022 | Spring 2022 | $120.00 |
| Convenience Points Purchases | CHARGE | 04/26/2022 | Spring 2022 | $25.00 |
| Convenience Points Purchases | CHARGE | 03/14/2022 | Spring 2022 | $25.00 |
| Late Payment Fee | CHARGE | 02/08/2022 | Spring 2022 | $400.00 |
| EPAY-Check Payment | PAYMENT | 02/07/2022 | Spring 2022 | $1,552.59 |
| EPAY-Check Payment | PAYMENT | 01/30/2022 | Spring 2022 | $1,500.00 |
| Convenience Points Purchases | CHARGE | 01/24/2022 | Spring 2022 | $25.00 |
| EPAY-Check Payment | PAYMENT | 01/19/2022 | Spring 2022 | $3,000.00 |
| Restricted Tuition Credit | PAYMENT | 01/18/2022 | Spring 2022 | $28,427.00 |
| Health Insurance Waived | PAYMENT | 01/14/2022 | Spring 2022 | $1,891.00 |
| Community Fee-Undergrad | CHARGE | 01/12/2022 | Spring 2022 | $64.00 |
| Health & Wellness Fee | CHARGE | 01/12/2022 | Spring 2022 | $235.00 |
| Health Insurance-Basic Plan | CHARGE | 01/12/2022 | Spring 2022 | $1,891.00 |
| Student Services Fee | CHARGE | 01/12/2022 | Spring 2022 | $329.00 |
| Tuition-Undergraduate | CHARGE | 01/12/2022 | Spring 2022 | $29,280.00 |
| Residence Charge-Room | CHARGE | 01/07/2022 | Spring 2022 | $7,255.00 |
| Housing Guarantee Payment | PAYMENT | 12/06/2021 | Spring 2022 | $600.00 |
| Housing Guarantee Forfeit | CHARGE | 08/27/2021 | Fall 2021 | $600.00 |
| Residence Charge-Room | CHARGE | 08/27/2021 | Fall 2021 | -$7,255.00 |
| Residence Charge-Room | CHARGE | 06/08/2021 | Fall 2021 | $7,255.00 |
| Housing Guarantee Payment | PAYMENT | 02/28/2021 | Fall 2021 | $600.00 |
| Balance As Of Summer 2, 2021 | PAYMENT | 04/22/2021 | Summer 2 2021 | $2,508.41 |

# EXHIBIT "4"

12/16/24, 5:30 PM



# BASILICA OF OUR LADY OF PERPETUAL HELP
## 1545 TREMONT STREET, BOSTON, MA 02120
### PHONE: 617-445-2600 • WWW.BOSTONSBASILICA.COM

December 16, 2024

To Whom It May Concern:

Re: Mr. Juan Bautista De Los Santos

Mr. Juan Bautista De Los Santos of 44 Supple Road, Dorchester, MA 02121 has been a faithful participant in the Eucharist at the Basilica of Our Lady of Perpetual Help for fifteen years. Prior to coming to the Basilica he attended Our Lady of Lourdes and St. Thomas Churches in Jamaica Plain. He also still participates in the Eucharist at these churches at times.

Mr. De Los Santos and his family are respected members of the community. He, himself, enjoys a good reputation. He was asked to be a godfather for Baptism, a sign of deep respect in the community, on four occasions. He is a very good father and husband, and a very diligent worker. He also takes an interest in the well being of the wider community. He has volunteered in a food pantry, which has provided help to the needy of the community.

If you are in need of further information, I can be reached at the above telephone number.

Sincerely,

Rev. Sean McGillicuddy, C.Ss.R.

REDEMPTORIST FATHERS



# OUR LADY OF LOURDES PARISH
14 Montebello Road
Jamaica Plain, MA 02130 USA
*Mailing address: 97 South Street, Jamaica Plain, MA 02130*
Tel: 617-524-0240  Fax: 617-524-1840

December 18, 2024.

To Whom It May Concern,

My name is Rev. Carlos Flor, and I am the current pastor at the parish of Our Lady of Lourdes, in Jamaica Plain, MA, of the Roman Catholic Archdiocese of Boston.

The main purpose of this letter is to speak on behalf of Mr. Juan De los Santos, who resides at 44 Supple Road, in Dorchester, Massachusetts.

Mr. De los Santos attends to our liturgical celebrations and has been a member of our parish community since 1988. He is married and is the father of four children.

Moreover, Mr. De los Santos is a good, disciplined citizen. He has all the necessary moral, Christian values to live in society, and therefore, he deserves all our trust.

If you have any more question regarding his present status, please do not hesitate to contact me at the number shown above.

Sincerely,

Rev. Carlos Flor
Pastor.

Scanned with CamScanner